# EXHIBIT "A"

## Wells v. National Board of Medical Examiners, et al.

## *Annette Swain, PhD., ABPP-CN*

*Clinical Psychology and Neuropsychology*

*15928 Ventura Blvd.  #231*
*Encino, CA  91436*

*2625 W. Alameda Ave.  #326*
*Burbank, CA  91505*

*(818) 385-0913*
*FAX:  (818) 385-1746*

### COMPREHENSIVE
### NEUROPSYCHOLOGICAL
### EVALUATION REPORT

Patient: Dr. Cornell Wells

Date of Examination: 08-06-2020,
08-10-2020, & 08-12-2020
Date of Report:  08-21-2020

Age:  44 years

### IDENTIFYING INFORMATION AND REASON FOR REFERRAL:

Dr. Cornell Wells is a 44-year-old, single, right-handed, African-American male, board certified psychiatrist, with a chronic history of reading comprehension, cognitive processing speed, and executive functioning problems.  He was referred for a comprehensive neuropsychological evaluation to assess his current cognitive status, to provide diagnostic clarification, and to make appropriate recommendations regarding the compensation for or mitigation of any cognitive or psychiatric condition.

### HISTORY OF PRESENT ILLNESS:

Dr. Cornell Wells reportedly was born on ████████████████, two months premature and at a weight of approximately 3 and one-half pounds  (pre-term, very low birth weight: PT/VLBW).  Details regarding his mother's pregnancy with him were not known.  Similarly, APGAR scores were unavailable.  Dr. Wells reportedly was in an incubator for the first two to three weeks of his life, but no other details regarding his early functioning were known.  Dr. Wells indicated that he was slow to catch up in growth and that he has always been small for his age. It is unclear when exactly the patient met his motor and verbal developmental milestones.

Dr. Wells reportedly had achievement difficulties throughout most of his academic career.  Dr. Wells recalled struggling in the first grade at Sacred Heart Catholic Elementary School in Washington DC, where he was not really focused and where he had difficulties learning how to read.  He reportedly was very chatty and was frequently punished by the nuns and his first-grade teacher.  The patient repeated the first grade the next year at Capitol Heights Elementary School while living with his grandmother in Maryland.  According to Dr. Wells' report, his father's girlfriend eventually helped him to learn how to phonetically sound out words, which facilitated the initial development of his reading abilities.  The patient demonstrated fewer behavioral issues during his repeat year of first grade.  After that year Dr. Wells reportedly returned to his mother's care and completed elementary school at Thaddeus Stevens Elementary School, doing "fairly well." However, Dr. Wells explained that he was "fairly chatty."  His mother and stepfather subsequently moved to Maryland, where the patient completed middle school.  Dr. Wells explained that he was very motivated by that time and really enjoyed math. He reportedly achieved straight "A's."  At age 14, in response to ongoing family issues, Dr. Wells returned to live with his grandmother. He also began to play the cello.

Dr. Wells reportedly began to struggle again academically in high school. He reportedly failed an entrance exam for admission into a science and tech program at a local magnet school. He could not recall if it was a timing issue, though he admitted he has always struggled on standardized tests. School was described as his emotional refuge, and initially he was very motivated. However, he often felt that he wasn't measuring up, leading to problems with depression. Music became his passion, and he would skip classes in school to practice his cello. The patient became enrolled in the National Symphony Orchestra's Orchestral Training Program at the Kennedy Center in Washington DC and received private lessons on full scholarship. He also was placed on a special academic schedule, allowing him to attend classes only for half days. Nevertheless, Dr. Wells' achievement declined, and he eventually dropped out during his senior year. While still in high school, Dr. Wells reportedly completed the PSAT and SAT, but reportedly performed poorly, further adversely impacting his mood and self-esteem.

At some point after dropping out from high school, Dr. Wells' was able to gain admission to George Washington University as a special student. The patient was not in a degree program but was permitted to take classes. He took classes for 2 semesters to finish his high school graduation requirements. Dr. Wells was subsequently accepted to a conservatory in San Francisco on a full scholarship and left George Washington to attend the conservatory. According to Dr. Wells' report, he had never learned how to read music proficiently and instead primarily learned to play pieces by ear. He reportedly struggled to integrate reading musical notes and rhythm simultaneously. This interfered with his ability to spontaneously read and play new music (a.k.a., sight reading), an essential skill for professional musicians. By his second year at the conservatory, his teacher reportedly described his skills as "dormant." Dr. Wells explained that he spent many hours practicing, but he did not practice efficiently. He instead would primarily practice music that he already knew how to play. Similarly, he did not progress academically, despite receiving tutoring for particular classes. Dr. Wells did not complete the program at the conservatory.

Following his departure from the conservatory, Dr. Wells was admitted to San Francisco State University (SFSU). He enrolled in holistic classes but reportedly suffered an emotional breakdown and withdrew his second semester from SFSU. He later returned and completed healing and psychology courses. The patient also completed a summer internship at a psychiatric hospital in Washington DC where he was exposed to the psychiatric element of medicine and began to develop an interest in psychiatry. Dr. Wells returned to San Francisco and continued his education at various community colleges, including Skyline College, as well as at SFSU. Attending classes at community college allowed him to enroll in smaller classes, which he found easier to tolerate and excel in. Nevertheless, Dr. Wells reportedly continued to experience difficulties with being able to initiate and organize himself, so as to perform well in his classes. He reportedly was very slow to complete his coursework, and it took seven years for Dr. Wells to complete his undergraduate degree. Of note, the patient eventually was enrolled in a very structured support program for minorities at SFSU, and that structure and support reportedly facilitated improvement in his performance. In addition, he completed psychoeducational testing at Skyline College (see below). Based upon that evaluation Dr. Wells was diagnosed with a Title 5 learning disability, warranting academic accommodations and a decelerated program. The structured support and accommodations reportedly allowed for him to complete his exams and coursework. Importantly, Dr. Wells won international poster competitions and cash awards for oral and poster presentations at scientific conferences as an undergraduate. Dr. Wells' cumulative GPA upon graduation from SFSU was approximately 3.2.

Dr. Wells elected to pursue a medical school education. He completed the MCAT exam but was not awarded any accommodations for the exam. According to the patient's report, he ran out of time on all the sections of the exam and scored quite poorly on it overall. His physical science score was a 9, verbal comprehension was approximately a 6, and biological science was an 8. The verbal comprehension score reportedly is in the range of someone who uses English as a second language. Dr. Wells subsequently enrolled as a PhD student in immunology at Stamford, as a preliminary step before applying to medical school. He struggled in the lab rotations and withdrew after only one semester.

Dr. Wells was subsequently admitted to the MD/PhD program at Albert Einstein College of Medicine in New York for his medical training. He explained that he stopped going to lectures, because he had difficulties focusing on the lectures and he found them too challenging. When attending lectures, the patient reportedly spent most of his lecture time "zoning out." He received tutoring services, and he reportedly did "okay seemingly." Dr. Wells reportedly was able to learn the new material, but he was not able to assimilate the material in order to pass his exams. As in the program at Stanford, Dr. Wells struggled with the lab component of the program. He completed 4 lab rotations, rather than the typical three. He reportedly had particular problems with benchwork. Although he was able to successfully complete the required graduate level coursework for the doctorate degree, he could not manage troubleshooting and executing his experiments independently.

Examinations in medical school were quite challenging for Dr. Wells. He failed two anatomy exams and a renal exam. Dr. Wells was subsequently forced to decelerate his training. For one of the exams, he reportedly had been told the preceding day that he needed to decelerate his education, which he found to be especially upsetting. He subsequent did not show up for the exam. Dr. Wells reportedly achieved four or five failures in medical school, and he was required to stand before the academic promotions committee. He subsequently was recommended to undergo psycho-educational testing.

Dr. Wells completed the psycho-educational evaluation in December 2010 through the Adult Literacy Program at Albert Einstein College of Medicine (see below). Based upon that assessment, Dr. Wells was diagnosed with Attention-Deficit/Hyperactivity Disorder, Combined Type and was awarded testing accommodations. Such assistance reportedly allowed him to finish his training. He passed his qualifying exam and left the PhD program with a Master's Degree.

Dr. Wells struggled not only in his classes and on exams in medical school, he also was challenged in his clerkships. Dr. Wells described himself as having problems organizing and presenting information regarding patients. He reportedly had poor memory for details, his mind would wander when getting information from patients, and he would get distracted in lectures. He reportedly was criticized for not being organized or being able to make his points in presentations.

Following his medical school training Dr. Wells completed his psychiatry residency training at California Pacific Medical Center in San Francisco (CPMC). Similar to his clerkship experience, he described having particular problems being succinct in case presentations. Attendees reportedly repeatedly complained that he was too slow and that his initial consult notes were unnecessarily detailed. Patients also reportedly expressed concern that he wasn't fully listening to them, because he was busy writing down information.

Dr. Wells applied for accommodations for his medical licensing exams. However, his request was denied due to a lack of sufficient evidence. The patient reportedly passed Step one

without the accommodations, but he had to retake Step 2CK. His scores were low average or marginal. Dr. Wells was unable to pass Step 3. He failed the exam 4 times, and in all cases, he ran out of time. (Of note, USMLE Step 3 involves not only demonstration of knowledge of medical principles and skills, but also completion of computer-based simulations to demonstrate the application of those skills in direct patient care.) Dr. Wells explained that when examining the content of the questions, he would have considerable difficulty filtering out non-essential information and he would frequently have to re-read the passages several times, which resulted in him losing precious time. As a result, he reportedly left many questions of the exam incomplete.

Despite not passing USMLE Step 3, Dr. Wells was able to attain his medical license in California. Dr. Wells practiced at Kaiser Permanente for two years between 2016 and 2018. He explained that while at Kaiser Permanente, he was reprimanded because he was behind on his notes. When listening to patients, he reportedly would attempt to write everything down and he would struggle with organizing his thoughts, especially if he did not have time to synthesize and assimilate what they were talking about. According to Dr. Wells' report, while employed at Kaiser he would spend over two hours a night on charting. He eventually transitioned a flexible schedule and went down to 80% time. This allowed him extra time to finish his notes and facilitated his ability to keep up with charting requirements. Following his tenure at Kaiser, Dr. Wells moved to Pacific Coast Psychiatric where he practiced outpatient psychiatry from 2018 to 2020. Dr. Wells' file was then audited, and he has been asked to re-sit for his exam. He is currently not employed.

## COGNITIVE AND FUNCTIONAL COMPLAINTS:

Dr. Wells described longstanding difficulties with reading comprehension. He explained that he is unable to finish reading books. Throughout high school and beyond, he reportedly depended on audio books and Cliff Notes to complete his book-related assignments and essays. The patient claimed that even with books that he finds interesting, it takes a while for him to complete. Dr. Wells described reading as mentally exhausting for him as he may need to read material two or three times before he comprehends it. This has been especially true if the material is complex. The patient added that he often has to read the material out loud, especially if the material is dense. He has found that reading aloud facilitates better comprehension of the material. Whether reading aloud or silently, though, Dr. Wells described himself as a slow reader. Of note, in high school, an English teacher reportedly refused to write him a college recommendation because that teacher did not feel the patient was adequately prepared for college.

Noted are lifelong problems with processing new information, and this issue becomes exacerbated as the complexity of the information increases. Dr. Wells complained of difficulties assimilating information into a cohesive whole and being able to do this in an efficient or expedited matter. The patient explained that his brain becomes flooded, and there is a lack of filter to be able to screen out unimportant, extraneous information. He complained that his thinking is not organized. These problems occur with both orally and visually presented information. Due to his inability to quickly process and assimilate new material, Dr. Wells claimed that he misses information.

Dr. Wells complained of longstanding attentional issues which have interfered not only with functioning in school and work but also in his home environment. He has had problems with regard to managing his finances. At one point during his residency the patient reportedly neglected to pay his student loan. He eventually defaulted on the loan, and his wages were garnished. The patient has needed to rely upon autopay so as to avoid late fees and late charges. Dr. Wells described himself as constantly misplacing items, and he reportedly has lost his cell

phone four times within the past few years. On one occasion, he reportedly left his entire key ring in the door of a public outdoor parking garage, which resulted in him having to pay hundreds of dollars to replace house and mailbox keys and to reprogram his lost electronic car keys. Losing important items including wallets, clothing, and keys reportedly are common occurrences for him. When cooking and following a recipe, he may forget to complete a particular step. He reportedly especially has difficulty if he is trying to prepare more than one thing at the same time due to a tendency to get distracted.

Dr. Wells complained of difficulties organizing his environment. His home becomes rather cluttered and attending to that clutter becomes a large chore. He finds himself procrastinating as it is overwhelming to organize his environment. He reportedly has tendencies to neglect to retrieve his mail to the point where his postman is unable to place any additional mail in his box. Dr. Wells then neglects to open his mail (which led to the failure to realize that he was behind in payments on his student loan.) He now has a housekeeper to assist with daily household cleaning and decluttering.

The patient described problems with automobile driving as well. He will reportedly zone out on the highway, resulting in him driving at excessive speeds. He has received several speeding tickets. Dr. Wells has missed turns or exits because he is slow to plan or look ahead, and then he is not ready to be able to make turns when needed. He has been involved in at least four minor collisions, three of which were within the last year. In one instance, Dr. Wells reportedly rear-ended another motorist, and in two other instances he was changing lanes without first checking for traffic.

Dr. Wells' history and presentation is significant for a degree of behavioral impulsivity. He described these issues as longstanding, but they did not become functionally impairing until high school and beyond. This was evident in medical school when he would blurt out answers before fully listening to a question. This would result in shame and embarrassment. In the past, he reportedly would "cut people off" in conversations. As a result of his behavior, the patient became progressively quieter over time because he was afraid blurting out "stupid" answers. His reticence has become a characteristic behavior pattern, and he reportedly now lets things "sit" for a minute before he may respond. Even at that point, though, he may be reluctant to speak out of a fear of being incorrect. His compensatory techniques have been effective but reportedly have severely impacted his life outside of work.

Impulsivity also has been reflected in Dr. Wells' activities outside of work or school. Throughout his adult life the patient reportedly has had a history of becoming quite involved in new hobbies or endeavors. At one point, the patient was involved in making lotions and creams and spent thousands of dollars in various oils to use in manufacturing these creams. At one point he also became much interested in aromatherapy. His interest eventually simply wears off, and his engagement in the endeavors suddenly ends.

## OTHER MEDICAL HISTORY:

Aside from Dr. Wells' noted PT/VLBW status, his medical history is significant for hypertension. He is currently maintained on blood pressure medications. He is status post isolated syncopal episode a few months prior to the current exam. He hit his face in the episode, but no other information regarding this event was available. He had one similar incident in medical school. He may have issues with orthostatic hypotension.

Dr. Wells' reportedly is considered pre-diabetic. He developed sepsis in 2018. No other medical conditions were reported.

## PSYCHIATRIC HISTORY:

Dr. Wells' psychiatric history is significant for depression during his high school years. This coincides with the increased difficulties functioning in the academic environment. There were also severe family stressors ongoing at that time. He was hospitalized for a month at one point during high school. In 1996 after his dismissal from the conservatory as a young adult, Dr. Wells developed panic disorder with agoraphobia, and he was hospitalized for one week. He was placed on Xanax. He has had chronic passive suicidal ideation.

Dr. Wells has received mental health services at least intermittently since high school. He is currently in therapy and has been maintained on Cymbalta. Previous medications include Lexapro. Both his depression and anxiety have been effectively managed with medication and psychotherapy.

## SUBSTANCE USE HISTORY:

Though he drinks only occasionally, Dr. Wells has had several isolated experiences of blacking out. He denied alcohol dependency and any other substance use.

## FAMILY HISTORY:

The patient's family history is significant for possible ADHD in his grandmother. Aunts and uncles were described as impulsive and reactive.

## SOCIAL HISTORY:

Dr. Wells was born in Washington, D.C. His mother was quite young, and the patient spent much of his time with his paternal grandmother. His grandmother eventually became his principal guardian. As indicated, the patient completed his undergraduate degree at San Francisco State University and his medical school training at Albert Einstein College of Medicine. He had been a practicing psychiatrist in the State of California. His license is currently inactive, and he has been asked to retake the medical licensing exams. He is single with no children. He lives independently.

## PREVIOUS TESTING:

*Skyline College.* Dr. Wells completed a psychoeducation exam at Skyline College with C. Lynne Douglas MS on May 22, 2000. A report providing test scores and Ms. Douglas' impression and recommendations was available for review. The Woodcock Johnson Tests of Achievement – Revised version (WJ-R) were administered. Results indicated especially strong single word reading ability, placing in the Superior range (SS=131, 98 percentile). In contrast, Dr. Wells' ability to use syntactic and semantic cues to identify missing words in text was considerably weaker and only in the Average range (SS=97, 42nd percentile). Reading comprehension based upon the Nelson Denny Reading Test was in the Average range (ss=106, 66th percentile), though it is unclear if this test was given under standard or extended time conditions. The patient's ability to analyze and solve orally presented math word problems, filtering out extraneous information, was in the Average range (ss=98, 45th percentile). Actual ability to perform mathematical computations, though, was in the High Average range (ss=113,

81st percentile; ss=110, 75th percentile), suggesting that his weaker performance on the WJ-R Applied Problems subtest was secondary to difficulties understanding the word problems rather than a difficulty with the calculations involved. Dr. Wells' writing abilities were quite weak and in the Low Average range (ss=81, 10th percentile). The patient was also administered the WAIS-III to assess his intellectual functioning. Basic IQ and index scores were provided, but individual subset scores were not included in the report. Dr. Wells general intelligence was estimated to be in the Average to High Average range (ss=110, 75th %ile) with significantly stronger verbal than visual, nonverbal, performance abilities. His verbal knowledge, understanding, and brief expression skills were estimated to be in the High Average range (ss=118, 88th percentile) while his organization, integration, and understanding of visual, nonverbal material was only in the low end of the Average range (ss=93, 32nd percentile). Based upon comparisons between his verbal IQ and achievement tests, Dr. Wells was found to have significant discrepancies in reading comprehension and writing. It was concluded that his reading comprehension adversely impacted his ability to understand and correctly complete word problems.

Based on this testing Ms. Douglas concluded that Dr. Wells met the eligibility criteria of the Title 5 learning disabilities definition. Ms. Douglas opined that without appropriate accommodations the patient's educational limitations would affect his ability to effectively process information. Dr. Wells was recommended to receive a word processor and to receive time plus one half for all examinations in a reduced distraction setting. He was to receive audio recorded lectures, have a reduced course load of 9 units, receive priority registration, become engaged in peer study groups, receive learning strategies training, and have a follow-up assessment for attention deficit disorder.

*Mary Kelly PhD.* Dr. Wells completed a psycho-educational evaluation with Dr. Mary Kelly in December 2010 after a series of exam failures during his third year of training at Albert Einstein College of Medicine. It was noted that he followed directions without difficulty and appeared to put forth full effort. During the second testing session, he was anxious about being timed, and he asked numerous questions to clarify directions. He appeared tired and yawned frequently. He talked while completing speeded tasks. A third session to look more closely at memory issues was unable to be scheduled.

As part of the evaluation, Dr. Wells was administered an IQ battery, tests of academic achievement, the Bender Visual-Motor Gestalt and a self-report ADHD rating scale. Examination of performance validity was not included. However, examination of the subscales of the WAIS-IV which are used as embedded measures of performance validity were well within normal limits. Thus, the test scores in this exam were likely a valid reflection of his current level of function. No estimate of premorbid ability was derived. Based on the exam, Dr. Wells' overall intellectual abilities were estimated to be in the average range, with significantly stronger crystallized verbal skills relative to his visual, non-verbal abilities. A relative strength was noted in the area of oral vocabulary development. His reasoning and his general fund of information or material learned in school were in the average to high average range. Processing speed was estimated to be in the high end of the average range. In contrast, Dr. Wells had difficulties with oral arithmetic abilities and particularly with visual-perceptual functioning, namely visual construction, spatial orientation and spatial reasoning. Of note, his Verbal Comprehension and Perceptual Organization/Reasoning index scores were consistent with his 2010 testing. On tests of achievement, the patient had an isolated especially poor score on the picture recognition task with his performance in the below average to exceptionally low range. Oral comprehension and reading fluency were relatively weak. Single word identification, spelling, and simple mathematical calculation, though, were relatively strong. Phonetic word generation was in the

average range. On a self-report measure of ADHD symptomatology, Dr. Wells endorsed a significant number and significant degree of symptoms, including memory issues, inattention, impulsivity, and self-concept. His approach to the Bender Visual-Motor Gestalt Test was suggestive of impulsivity. Based on this evaluation, Dr. Wells was diagnosed with Attention-Deficit/Hyperactivity Disorder, Combined Type. He was recommended accommodations, specifically to take tests in a private location with time-and-a-half extended time. Dr. Wells was recommended to consult with psychiatry regarding treatment options for his attentional issues. Provided were strategies for improving attention and names of books about managing his inattentiveness. Further memory testing was encouraged. The patient was also recommended to have his hearing evaluated.

*Gerald Baltz, NP.* Dr. Wells was evaluated by Gerald Baltz in July 2019. Mr. Baltz is a board-certified psychiatric nurse practitioner who has been treating Dr. Wells for ADHD since May of 2019. Based on his findings and the patient's prior records, Mr. Baltz asserted that the patient suffers from ADHD, Primarily Inattentive Type. Mr. Baltz then outlined the DSM-5 diagnostic criteria for ADHD and asserted that Dr. Wells met the following symptom criteria: Often fails to give close attention to details or makes careless mistakes in schoolwork, at work, or during other activities; often has difficulty sustaining attention in tasks or play activities; often does not seem to listen when spoken to directly; often does not follow through on instructions and fails to complete schoolwork, chores, or duties in the workplace; often has difficulty organizing tasks and activities; often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort; often loses things necessary for tasks or activities; is often easily distracted by extraneous activities; and is often forgetful in daily activities. Mr. Baltz argued that Dr. Wells did not meet a sufficient number of criteria to be diagnosed with the Hyperactivity/Impulsivity component of ADHD. He did observe that the patient often fidgets with or taps his hand or feet or squirms. Mr. Baltz also noted that Dr. Wells often talks excessively and often blurts out an answer before the question has been completed. Mr. Baltz argued that the patient's symptoms were present prior to age 12 and have been present in more than one setting.

Mr. Baltz explained that the patient's symptoms previously went undiagnosed because his hyperactivity was not severe enough to warrant attention. Mr. Baltz further described Dr. Wells as suffering from difficulty with visual-spatial memory which was demonstrated in the report from Dr. Kelly. Mr. Baltz explained that this was salient because visual-spatial memory results can be causatively correlated with ADHD. He argued that the patient's problems with concentration and distractibility were not related to any history of depression, and, rather, the ADHD contributed to his depression. Mr. Baltz urged that Dr. Wells has been practicing successfully as a psychiatrist despite the ADHD due to his tenacity and intellect. He argued that Dr. Wells is entitled to and needs proper accommodations for his diagnosed ADHD. He recommended time plus one-half as well as added break times and a private examination room to minimize distractions.

## RELATIVE RESEARCH:

Impaired cognitive function is the most common neurologic impairment in infants born very preterm (VP, gestational age < 32 weeks) or with very low birth weight (VLBW < 1500 g) (Breeman et al., 2015). Meta-analyses have found statistically higher rates of attention deficits in children born preterm (PT, Bhutta et al, 2002, Aarnoudse-Moens et al 2009b). Two-third of the studies reviewed in those meta-analyses reported higher prevalence of attention problems in children born preterm compared with FT controls. Children born preterm have higher rates of learning disability, grade retention, special education needs, ADHD, behavior problems, and

social emotional difficulties than full term peers (Bhutta et al., 2002; Aarnoudse-Moens et al 2009b). Children and adolescents born PT have statistically significantly lower scores than FT controls on tests of working memory, planning skills, selective attention, sustained attention, response inhibition, and verbal fluency, especially phonemic fluency (Aaroudse-Moens et al., 2009a, Mulder et al. 2009, Stjernqvist & Svenningsen, 1999), all of which are aspects of executive functioning.

The research has also shown that these problems for PT or VLBW individuals do not diminish with growth. Lohaugen et al (2010) found that learning deficits persist into adolescence and are apparent even in those persons with normal intelligence and no neurological impairment. VLBW children at age 10 are more likely than their peers to have problems in speech and language, vision, fine and gross motor tasks, illness, attention, and school performance. They also have increased requirements for therapy and accommodation, and repetition of a grade was over three times higher for VLBW groups (Hilman et al, 2019). Rose and Feldman (1996) found 11-year olds with BW < 1500 g have poor performance on memory tasks and processing speed, which accounted for much of their 10-point difference in IQ scores, compared to their FT controls. Fourteen-year olds with BW < 1500 g without cerebral palsy have lower scores on tests of visual processing, visual memory, learning, and problem solving. Skranes et al (2008) showed that of adolescents with BW at or below 1500 g., 18% had major visual perceptual impairment, 9% had minor visuoperceptual impairment and 27% had ventricular dilation on brain MRI at age 15. Luu et al (2009a, b) found that for 16 year olds born between 1989 and1992, those with BW < 1250 with no neurosensory impairments and IQ scores above 70 had statistically significantly lower mean scores than FT controls on tests of phonological fluency, verbal inhibition, immediate verbal memory, delayed verbal memory, immediate visuospatial memory, and delayed visuospatial memory. There is a higher prevalence of attention deficits and school problems and evidence of persistence of negative consequences of LBW resulting from preterm birth, and the most significant differences between VLBW/PT and controls are found in visuoperceptual functioning (Aarnoudse-Moens et al 2009b, Farooqi et al. 2006, Luu et al, 2009a).

The research literature has also clearly shown that the cognitive and academic deficits experienced by PT and VLBW individuals extends even through adulthood. (Allen et al., 2010; of note, the number of these studies is understandably smaller given the exceedingly difficult aspect of tracking individuals over periods of several decades.) Young adults 18-27 those whose BW were below 1500 had slower reaction times than FT controls on simple, choice, working memory, divided attention and associated learning reaction time. (Nosarti et al. 2007). Pyhala et al. (2011) document that VLBW adults show less attention to detail than controls. Adults at age 26 who were born VP/VLBW show significantly lower IQ and executive functioning (Madzwamuse et al., 2015). In Madzwamuse et al. (2015), there was approximately a 1.6 SD unit difference between VP/VLBW and controls on Full Scale IQ which could not be accounted for by smallness for gestational age. Their results also showed that there was no narrowing of cognitive deficits between VP/VLBW and term control adults relative to previous childhood assessments at six years of age. In fact, VP/VLBW adults do not outgrow their cognitive problems despite many receiving special educational support in childhood, and the greatest differences in their study were found in the areas of visual search, visual selectivity and executive attention. They also showed that these adults suffer from multiple cognitive problems (Madzwamuse et al, 2015). VP/VLBW adults have problems in cognitive flexibility, inhibition, visual selectivity, attention, word fluency, and processing speed (Pyhala et al, 2011, Strang-Karlsson et al. 2010).

Executive functioning continues to be adversely impacted in PT/VLBW adults. Pyhala et al. (2011) found that differences in visuospatial encoding between PT/VLBW adults and FT controls attenuated but remained significant after controlling for FSIQ. This was thought to be

due to specific impairments in visual short-term memory storage capacity. Pyhala et al (2011) also concluded that VP/VLBW adults may have general problems with higher order EF activities that require complex processing and attention skills beyond the effect of general cognitive ability. This is consistent with a workload model proposing that with increasing workload of cognitive tasks, lower gestation groups perform exponentially more poorly (Jaekel, Baumann & Wolke 2013).

As already indicated, an area typically adversely impacted in PT/VLBW children and adults is attention. However, there appear to be differences in the attentional impairments in these persons relative to individuals with classic ADHD. "The attention problems of adolescents born preterm may be different from the classic ADHD diagnosis. PT adolescents had statistically significant higher inattention scores than controls but no significant group difference in hyperactivity" (Indredavik et al; 2004). Only a third of PT adolescents with inattention symptoms qualified for ADHD or ADD diagnoses. Corcoles et al. (2019) found that some of the basic components of attention were preserved in the VP-VLBW group but they had poorer immediate memory and phonological fluency relative to control levels, suggesting that higher order executive functions, likely dependent on prefrontal connectivity with cortical (temporal, parietal) and subcortical structures (diencephalon, striatum) had been adversely affected.

Underlying brain injury and failure of normal brain growth throughout the life span may account for the differences in PT/VLBW and their FT controls. In a study of adolescents with BW at or below 1500 g nearly 20% had impaired problem solving and cognitive flexibility. All of these adolescents had ventricular dilation, and most had significantly reduced white matter volume and thinning of the corpus collosum (Skranes et al, 2008; Skranes et al, 2007). Disturbed connectivity between parietal regions and the prefrontal cortex also appear to underlie the executive functioning deficits seen in these adolescents (Skranes et al. 2009). There is also research to suggest that neuromaturation typical in the adolescent years may not occur in preterm individuals. Corcoles et al. (2019) found that VPT/VLBW individuals show smaller volume in total GM, subcortical GM, thalamus, and fusiform gyrus and enlarged lateral ventricles relative to controls. Importantly, Nosarti et al. (2008) demonstrated that cortical distribution of both gray and white matter in PT adolescents is associated with neurocognitive functioning. Gimenez et al. (2006) also found correlations between thalamic size and verbal fluency impairments in PT individuals.

Reading comprehension has been shown to be dependent upon executive functioning skills, and comprehension of reading material is impacted by working memory, planning, organizing reasoning, critical analysis, and monitoring. Some children struggle to understand what they read despite having single word reading skills that are intact. Thus, individuals who read fluently but do not understand what they read may have problems with executive functioning. Planning skills in particular is a component of executive function that is related to reading comprehension. Namely, children who struggle with reading comprehension tend to perform worse than typically developing peers on measures that require planning an organized response (Sesma et al, 2009). Sesma et al. (2009) also found that working memory and planning abilities account for 63% of the variance in reading comprehension. Importantly, executive function skills differentially support reading comprehension but are less necessary for single word reading. This is present even after accounting for attention, decoding, fluency, and vocabulary skills. Sesma et al (2009) argue that children with reading comprehension deficits tend to have difficulty planning an organized, structured approach to tasks and may require longer planning times. This relationship holds even when accounting for more "basic" skills known to contribute to proficient reading comprehension. Furthermore, executive control skills such as planning and

working memory become more necessary as the length and complexity of written text increases (Novais-Santos et al. 2007). Executive functioning deficits have also been found with children with dyslexia (Reiter et al., 2005). Recent research further demonstrates an association between perceptual organization skills and reading comprehension (Strothers and Klein 2010), suggesting that reading comprehension is an integrative process involving nonverbal cues to help convey the meaning of text. Thus, the impairments in reading comprehension in PT/VLBW individuals without an actual learning disability may stem from their well-documented executive dysfunction and visuoperceptual impairments, adversely impacting their ability to maintain the information in working memory, plan and maintain an organized, structured approach to the task of reading, and integrate nonverbal processes in the effort to discern the meaning of the given text. This would be accentuated when attempting to read complex material.

Citations are presented in an appendix at the end of this report.

## BEHAVIORAL OBSERVATIONS/MENTAL STATUS:

Because of ongoing pandemic issues, initial interview was completed with Dr. Wells via tele-medicine. Neuropsychological testing itself was completed in office across two testing days. Dr. Wells arrived ten minutes late for his initial exam due to failure to leave the house in a timely manner. He presented as a medium-build, right-handed, African-American male, who was nicely dressed and well groomed, and who looked younger than his stated age. By interview, he was alert and fully oriented. However, he took several seconds to be able to determine the day of the month. He was able to correctly identify his birth date and age. Dr. Wells correctly identified the current and two most recent U.S. presidents. Eye contact was excellent. Conversational speech was fluent with a normal rate and prosody. He spoke with a modestly soft voice. No circumlocutions or semantic, phonemic, or neologistic paraphasic errors were observed. No significant word finding issues were noted. His receptive language skills appeared to be intact. Gross motor functioning was unremarkable. Dr. Wells ambulated independently with no apparent gait or balance issues. There was no evidence of any restlessness, agitation, or fidgety behavior. No pain behavior was observed. No fine motor difficulties were noted. However, on a timed writing test, he completed the items by printing rather than cursive writing. His printing was not especially sloppy. Dr. Wells expressed feeling a content mood, and he demonstrated a pleasant affect. He expressed understandable concern about his current situation, but at no time did he demonstrate any behavioral or emotional dyscontrol or emotional lability. Thought processes were linear and goal directed. There was no evidence of any tangentiality, circumstantiality, flight of ideas, derailment, homicidal or suicidal ideation, hallucinations or delusions. His insight and judgment appeared to be intact.

Dr. Wells was observed during testing to take a considerably large amount of time to be able to complete some of the items. On a non-verbal abstract reasoning test, he took over a minute on average to do each single item. On a visual-motor tracking task, on the first and second trails, he took quite a bit amount of time to find initial numbers, deflating his overall performance and score. Dr. Wells needed a considerable amount of time to be able to provide digits in a backward order. He was observed to take numerous seconds in his mind constructing the answer before providing it. The patient appeared to rush to complete his drawings on an immediate visual learning and memory task, questioning whether he was anxious that he would forget the presented designs. There was poor organization to his recall of words on a serial list-learning task. He also took exceedingly long period of time to complete trials on an executive planning task.

When he was asked to copy a complex figure, the patient started his copy too high on the page. As a result, some of the details of the design were crammed up on the top of the page. This appeared to reflect poor initial planning on how to approach the task and where to place his drawing on the given page.

**MEDICATIONS AND VITAMINS**:

On the days of the current exam, Dr. Wells was taking the following medications: Propranolol, losartan, vitamin D, and Cymbalta.

**PROCEDURES:**

Clinical Interview
Wechsler Adult Intelligence Scale – IV (WAIS-IV)
Wechsler Memory Scale – IV (WMS-IV, selected subtests)
Rey-Osterrieth Complex Figure Test (ROCFT)
Rey Auditory Verbal Learning Test (RAVLT)
Verbal Fluency (FAS)
Animal Naming
Expressive Vocabulary Test – II (EVT-II)
Ruff Figural Fluency
Neuropsychological Assessment Battery (NAB, Mazes subtest)
Comprehensive Trailmaking Test (CTMT)
Stroop Test
Tower of London (TOL)
Category Test
VSVT
Dot Counting Test (DCT)
Boston Diagnostic Aphasia Examination (BDAE, Complex Ideational Material subtest)
Advanced Clinical Solutions (ACS, Test of Premorbid Function [TOPF])
Connors Continuous Performance Test – 3 (CPT3)
Minnesota Multiphasic Personality Inventory – 2 (MMPI-2)
Behavior Rating Inventory of Executive Function – Adult Version (BRIEF-A)
BAARS-IV

**TEST RESULTS**:

Scores for the administered neuropsychological tests are presented as percentiles. Interpretation and percentile ranks are as follows: 0 to 1st percentile: Exceptionally Low Range; 2nd to 8th percentile: Below Average range; 9th to 24th percentile: Low Average range; 25th to 75th percentile: Average range, 76th to 91st percentile: High Average range; 92nd to 98th percentile: above Average range; greater than 98th percentile: Exceptionally High range.

| PERFORMANCE VALIDITY TESTING | | | |
|---|---|---|---|
| Test | | Performance Level | Raw Score |
| Reliable Digit Span | | Adequate | 13 |
| ROCFT Effort Equation | | Adequate | 51 |
| VSVT | Easy Items | Valid | 22 |
| | Hard Items | Valid | 24 |

|  | Total | Valid | 46 |
|---|---|---|---|
| Dot Counting Test | LD Sample | Valid | 11 |

**Summary of Performance Validity Testing:** Several embedded and freestanding measures of effort and motivation were administered to assess the accuracy and validity of the patient's current test results. Scores indicated adequate effort. *Thus, the test scores obtained in the current exam may be taken as a valid reflection of Dr. Wells' current level of function.*

| PREMORBID FUNCTIONING | | | | | |
|---|---|---|---|---|---|
| Function | Test | Performance Level | %ile | Standard Score | Raw Score |
| Premorbid Functioning | ACS Test of Premorbid Function | High Average | 82nd | 114 | 57 |
|  | WAIS-IV Vocabulary | High Average to Above Average | 91st | 14 | 50 |

**Summary of Premorbid Functioning Measures:** Dr. Wells was administered the ACS – Test of Premorbid Functioning (TOPF) to provide an estimate of his premorbid levels of ability. This test is a list of 70 English words which is co-normed with the WAIS-IV. His score on this test was in the High Average range (82nd percentile). Vocabulary subtest of the WAIS-IV was used as an alternate estimate of premorbid function, as vocabulary development tends be stable throughout the lifespan. Dr. Wells' score on this test was modestly stronger and in the High Average to Above Average range (91st percentile). *Together, these reflect quite strong premorbid abilities and function. In Dr. Wells' case, "premorbid" should be interpreted as cognitive abilities unimpeded by brain injury, including prenatal and neonatal injury.*

| INTELLECTUAL FUNCTIONING | | | | | |
|---|---|---|---|---|---|
| Function | Test | Performance Level | %ile | Standard Score | Raw Score |
| Overall Intellectual Abilities | WAIS-IV FSIQ | Average | 47th | 99 (95% CI: 95-103) | Sss= 99 |
| Verbal Comprehension | WAIS-IV Verbal Comprehension Index | High Average | 79th | 112 (95% CI: 106-117) | Sss= 37 |
|  | WAIS-IV Similarities | Average to High Average | 75th | 12 | 30 |
|  | WAIS-IV Vocabulary | High Average to Above Average | 91st | 14 | 50 |
|  | WAIS-IV Information | Average | 63rd | 11 | 16 |
| Perceptual Reasoning | WAIS-IV Perceptual Reasoning Index | Low Average | 12th | 82 (95% CI: 77-89) | Sss=21 |
|  | WAIS-IV Block Design | Below Average to Low Average | 9th | 6 | 24 |
|  | WAIS-IV Matrix Reasoning | Average | 63rd | 11 | 20 |
|  | WAIS-IV Visual Puzzles | Below Average to Exceptionally Low | 2nd | 4 | 6 |
|  | WAIS-IV Picture Completion | Below Average to Exceptionally Low | 2nd | 4 | 5 |
| Working Memory | WAIS-IV Working Memory Index | Average | 50th | 100 (95% CI: 93-107) | Sss= 20 |

| | WAIS-IV Digit Span | Average | 50th | 10 | 29 |
|---|---|---|---|---|---|
| | WAIS-IV Arithmetic | Average | 50th | 10 | 14 |
| **Processing Speed** | WAIS-IV Processing Speed Index | Average | 55th | 102 (95% CI: 93-110) | Sss=21 |
| | WAIS-IV Coding | Average | 63rd | 11 | 73 |
| | WAIS-IV Symbol Search | Average | 50th | 10 | 33 |

VCI> PRI, WMI, p< .05; WMI, PSI > PRI p < .05

**Summary of Intellectual Functioning Measures:** Dr. Wells was administered the WAIS-IV to assess his intellectual abilities and function. *He achieved a Full-Scale IQ of 99, placing in the Average range. This score was modestly but not significantly weaker than his psycho-educational testing in 2010.*

The WAIS-IV general intellectual estimate is comprised of four independent factors as reflected by the following index scales: Verbal Comprehension Index (VCI), Perceptual Reasoning Index (PRI), Working Memory Index (WMI), and Processing Speed Index (PSI). Dr. Wells' verbal knowledge, conceptualization, and brief expression skills, as reflected by the Verbal Comprehension Index, were in the High Average range (79th percentile). This was consistent with his 2010 testing. Dr. Wells' score on the WAIS-IV Working Memory Index was in the Average range (50th percentile). This index reflects attention and concentration abilities requiring the auditory processing of orally presented verbal information as well as the ability to hold information in memory and integrate it with material accessed from long-term memory. This also was consistent with his 2010 testing. Dr. Wells' speed of processing of relatively simple visual, non-verbal abstract stimuli and his motor response speed, as reflected by the Processing Speed Index, was in the Average range. This area was modestly declined relative to 2010 testing. Finally, Dr. Wells' organization, integration, and processing of visual, non-verbal abstract stimuli, as reflected by the Perceptual Reasoning Index, was in the Low Average range (12th percentile). His performance in this area was significantly declined relative to his testing in 2010. His Verbal Comprehension Index score was significantly stronger than his Perceptual Reasoning and Working Memory Index scores. His Working Memory and Processing Speed Index scores were also significantly stronger than his Perceptual Reasoning Index score.

| ATTENTION & WORKING MEMORY | | | | | | |
|---|---|---|---|---|---|---|
| **Function** | **Test** | | **Performance Level** | **%ile** | **Standard Score** | **Raw Score** |
| **Immediate Auditory Attention** | WAIS-IV Digit Span Forward | | High Average | 84th | 13 | 13 (9 digits forward) |
| | AVLT - Trial 1 | | Low Average | 23rd | Z=-0.75 | 5 |
| **Visual Attention** | Stroop Test Word Reading Trial | | Average | 38th | T=47 | 103 |
| | Stroop Test Color Naming Trial | | Low Average | 18th | T=41 | 66 |
| | WMS-IV Symbol Span | | Below Average to Low Average | 9th | 6 | 15 |
| | Comprehensive Trailmaking Test | Trail 1 | Low Average | 14th | T= 39 | 52 seconds |
| | | Trail 2 | Low Average | 18th | T= 41 | 43 seconds |
| | | Trail 3 | Low Average to Average | 24th | T= 43 | 42 seconds |

| Working Memory | WAIS-IV Digit Span | | Average | 50th | 10 | 29 |
|---|---|---|---|---|---|---|
| | WAIS-IV Digit Span Backward | | Average | 63rd | 11 | 10 (6 digits backward) |
| | WAIS-IV Digit Span Sequencing | | Low Average | 16th | 7 | 6 (4 digits in sequence) |
| | WAIS-IV Arithmetic | | Average | 50th | 10 | 14 |
| | WAIS-IV Working Memory Index | | Average | 50th | 100 (95% CI: 93-107) | Sss= 20 |
| Vigilance | Continuous Performance Test -III | Omissions | Average | NA | T= 45 | NA |
| | | Commissions | Low | NA | T= 36 | NA |
| | | HRT | Average | NA | T= 48 | NA |
| | | HRT SD | Low | NA | T= 44 | NA |
| | | Variability | Low | NA | T= 44 | NA |
| | | Detectability | Low | NA | T= 31 | NA |
| | | Perseverations | Average | NA | T= 45 | NA |
| | | HRT Block change | Low | NA | T= 30 | NA |
| | | HRT ISI change | Average | NA | T= 53 | NA |

**Summary of Attention, Concentration, and Working Memory Ability Measures:**
Variable scores were documented on tests of Dr. Wells' attention, concentration, and working memory abilities. *He had relative weaknesses in the area of visual attention, especially with visual scanning requirements. Immediate attention was intact, but Dr. Wells was overwhelmed by large amounts of information presented simultaneously.*

Dr. Wells was administered the Conners' CPT-3 to further assess his concentration over time. The CPT-3 is a computerized continuous performance test for the assessment of attention. It lasts 14 minutes, allowing for a more accurate assessment of attention over time than that which can be assessed using most other standard neuropsychological tests. It involves the processing of single letters (as opposed to words, phrases, or sounds). *Dr. Wells' performed acceptably on this test.* He missed an average percentage of targets and responded to a lower percentage of non-targets when compared to the normative group. His mean response speed for correct responses for the whole administration was in the average range and about the same as the normative group's response speed. His response speed was more consistent during the entire administration than the normative group and the variability in his response speed was lower when compared to the normative group. There was no indication of problems with impulsivity. There were an average number of perseverative errors and anticipatory responses compared to the normative group. He sustained increased response speed in later blocks and there was no significantly error increase across multiple adjacent blocks. He had an average reduction in response speed at longer interstimulus intervals and there was no statistically significant increase in error rates. Thus, there was insufficient evidence to suggest problems with maintaining vigilance at varying levels of response frequency.

| COGNITIVE PROCESSING SPEED | | | | | |
|---|---|---|---|---|---|
| Function | Test | Performance Level | %ile | Standard Score | Raw Score |
| Psychomotor Speed | WAIS-IV Processing Speed Index | Average | 55th | 102 (95% CI: 93-110) | Sss=21 |
| | WAIS-IV Coding | Average | 63rd | 11 | 73 |

| WAIS-IV Symbol Search | Average | 50th | 10 | 33 |
|---|---|---|---|---|
| Stroop Test Word Reading Trial | Average | 38th | T=47 | 103 |
| Stroop Test Color Naming Trial | Low Average | 18th | T=41 | 66 |
| Connors Continuous Performance Test III– Hit Reaction Time | Average | N/A | T= 48 | N/A |

**Summary of Cognitive Processing Speed Measures:** *Dr. Wells' cognitive processing speed abilities were in the Average range, below expectation given his estimated premorbid levels of ability.* It is also noteworthy that he had relative difficulties on a color naming test suggesting some difficulties with cognitive efficiency and the transfer of cognitive information from one brain region to another.

| EXPRESSIVE/RECEPTIVE LANGUAGE SKILLS AND COMMUNICATIVE ABILITIES | | | | | |
|---|---|---|---|---|---|
| Function | Test | Performance Level | %ile | Standard Score | Raw Score |
| Phonemic Fluency | FAS | Below Average to Low Average | 8th | T= 36 | 26 |
| Categorical Fluency | Animal Naming | Average | 69th | T= 55 | 23 |
| Naming/ Expressive Vocabulary | EVT-II | Average; GE > 12.5 (ceiling) | 68th | SS=107 | 167 |
| | WAIS-IV Vocabulary | High Average to Above Average | 91st | 14 | 50 |
| | WAIS-IV Verbal Comprehension Index | High Average | 79th | 112 (95% CI: 106-117) | Sss= 37 |
| Receptive Language | BDAE Complex Ideational Material | Low Average | 12th | SS=38 | 11 |
| | Comprehensive Trailmaking Test, Trail 4 | Exceptionally Low | < 1st | T=27 | 78 seconds |

**Summary of Expressive and Receptive Language Skills and Communicative Ability Measures:** Generally strong scores were documented on tests of Dr. Wells' expressive language skills and communicative abilities. *However, his receptive language skills appeared to be relatively weak and well below expectation, especially given his strong verbal expression abilities.* He also had a particularly weak performance on a phonemic fluency test. Reading words as part of a visual-motor tracking task was especially slow, but he was able to complete that task (CTMT – Trail 4) without error.

| VISUAL-SPATIAL FUNCTIONS | | | | | |
|---|---|---|---|---|---|
| Function | Test | Performance Level | %ile | Standard Score | Raw Score |
| Visuoconstruction | WAIS-IV Block Design | Below Average to Low Average | 9th | 6 | 24 |
| Abstract Reasoning Abilities | WAIS-IV Matrix Reasoning | Average | 63rd | 11 | 20 |
| Spatial Reasoning | WAIS-IV Visual Puzzles | Below Average to Exceptionally Low | 2nd | 4 | 6 |

| Visuoperception | WAIS-IV Picture Completion | Below Average to Exceptionally Low | 2nd | 4 | 5 |
| | WAIS-IV Perceptual Reasoning Index | Low Average | 12th | 82 (95% CI: 77-89) | Sss=21 |
| | Rey Complex Figure Test - copy | Exceptionally Low | <1st | NA | 26.5 |

**Summary of Visual-Spatial, Visual-Perceptual, and Visual Organizational Ability Measures**: *Generally weak scores were documented on tests of Dr. Wells' visual-spatial, visual-perceptual, and visual organizational abilities. The patient had particular difficulties with attention to visual detail and with spatial reasoning.* His copy of a complex figure (ROCFT) was well organized. However, because of poor planning and initiating his copy too high on the page, there were several distortions to his depiction. Noteworthy, the distortions were primarily in the upper half of the figure (correlating with frontal executive dysfunction).

| LEARNING and MEMORY | | | | | | |
|---|---|---|---|---|---|---|
| Function | Test | | Performance Level | %ile | Standard Score/ Scale Score | Raw Score |
| **Verbal Learning & Memory** | | | | | | |
| Immediate noncontextual verbal learning and Memory | Rey Auditory Verbal Learning Test (RAVLT) 5, 7, 8, 11, 11 | | | | | |
| | | Initial Recall (trial 1) | Low Average | 23rd | Z=-0.75 | 5 |
| | | Trial 5 | Average | 44th | Z=-0.16 | 11 |
| | | Trials 1-5 | Average | 27th | Z=-0.61 | 42 |
| | | List B | Average | 30th | Z=-0.53 | 5 |
| | | Short delay recall (Trial 6) | Average | 62nd | Z=0.3 | 10 |
| Delayed noncontextual Memory | | 30-minute delay recall | Average | 57th | Z=0.18 | 10 |
| | | 30-minute recognition | High Average | 78th | Z=0.77 | 14 TP |
| | | | NA | NA | NA | 0 FP |
| **Immediate Story Passage Memory** | WMS-IV Logical Memory I | | Average | 50th | 10 | 25 |
| **Delayed Story Passage Memory** | WMS-IV Logical Memory II | | Average | 37th | 9 | 20 |
| | WMS-IV Logical Memory Recognition | | Average | 51-75th | NA | 25 |
| **Visual Learning & Memory** | | | | | | |
| Immediate Visual Learning and Memory | WMS-IV Visual Reproduction I | | **Below Average** | 5th | 5 | 27 |
| | WMS-IV Visual Reproduction II | | Low Average | 16th | 7 | 18 |

| Delayed Visual Memory | WMS-IV Visual Reproduction Recognition | | Low Average | 17-25th | NA | 5 |
| | ROCFT | 3-minute delay recall | **Below Average** | **4th** | **T=33** | **13.5** |
| | | 30-minute delay recall | **Exceptionally Low** | **<1st** | **T=24** | **10.5** |
| | | Recognition | WNL | WNL | NA | 8 TP |
| | | | WNL | WNL | NA | 2 FP |

**Summary of Verbal and Non-Verbal Learning and Memory Measures**: Variable scores were documented on tests of Dr. Wells' verbal and non-verbal learning and memory abilities. *He demonstrated a relative weakness in the acquisition of orally presented verbal information, but he benefited significantly from repetition.* There was no evidence for significant interference, and he was able to recall that which he could initially learn. *Visual memory, however, was much weaker and this appeared to be secondary to the initial perceptual dysfunction.* He could recognize previously presented visual material. Overall, results indicated difficulties with acquisition more than retention or retrieval.

| EXECUTIVE FUNCTIONING & FRONTAL SYSTEMS ABILITIES | | | | | | |
|---|---|---|---|---|---|---|
| Function | Test | | Performance Level | %ile | Standard Score | Raw Score |
| Abstract Reasoning/ Concept Formation | WAIS-IV Similarities (verbal) | | Average to High Average | 75th | 12 | 30 |
| | WAIS-IV Matrix Reasoning (nonverbal) | | Average | 63rd | 11 | 20 |
| Mental Flexibility | Comprehensive Trailmaking Test – Trail 5 | | Average | 42nd | T=48 | 50 seconds, errors |
| Nonverbal Fluency | Ruff Figural Fluency – total unique designs | | **Exceptionally Low** | **< 1st** | **T < 28.1** | **30** |
| Inhibition | Stroop Test Color-Word Trial | | Low Average | 18th | T=41 | 46 |
| Phonemic Fluency | FAS | | Below Average to Low Average | 8th | T= 36 | 26 |
| Organization | ROCFT Copy | | Very good organization But poor planning with regard to placement on page | | | |
| Planning | TOL | Correct | Below Average to Low Average | 8th | NA | 1 |
| | | Total Moves | **Exceptionally Low** | **<1st** | **NA** | **92** |
| | | Initiation Time | High Average (slow to start) | 79th | NA | 69 seconds |
| | | Total Time | **Exceptionally Low** | **<1st** | **NA** | **699 seconds** |
| | | Rule Violations | **Below Average** | **4th** | **NA** | **1** |
| Problem Solving | Category Test – total errors | | Low Average | 10th | SS=37 | 39 |
| | NAB Mazes | | **Below Average** | **5th** | **T=34** | **5** |

**Summary of Executive Functioning and Frontal Systems Ability Measures**: Widely variable scores were documented on tests of Dr. Wells' executive functioning and frontal systems abilities. His reasoning abilities remained relative strengths both within this domain and across domains. *However, the patient had particular impairments in this domain, especially with*

*elements of visual, non-verbal material.* His problem-solving abilities were well below expectation, and he had particular impairments in spatial analysis and synthesis. Fluency and initiation were weak. *Planning was especially poor.* He was able to complete his tasks but took an exceptionally long period of time with an exceptionally large number of moves or steps to take in order to complete the given tasks. Behavioral control appeared to be intact.

| PSYCHOLOGICAL FUNCTIONING | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Function | Test | Performance Level | | | | | | | | | |
| Psychological Function | MMPI-2 (T-scores) | VRIN 69 | TRIN 57F | F 67 | Fb 79 | Fp 56 | FBS 59 | L 43 | K 49 | S 41 | |
| | | 1 65 | 2 89 | 3 74 | 4 77 | 5 62 | 6 64 | 7 71 | 8 68 | 9 47 | 0 80 |
| | | RCs 71 | RC1 60 | RC2 72 | RC3 47 | RC4 59 | RC6 56 | RC7 58 | RC8 47 | RC9 38 | |

**Summary of Psychological Functioning Measures**: Dr. Wells was administered the MMPI-2 to assess his psychological status and characterological functioning. Results indicated that he approached the questionnaire in an open and honest manner, rendering a response profile valid for interpretation.

The patient tests as experiencing a significant degree of emotional turmoil. He is likely to report feeling depressed and anxious with difficulties concentrating. Somatic complaints may be present that would increase in times of stress. He appears to be overwhelmed by the demands of his life and he may feel incapable or coping with his current circumstances. Most evident in the testing is a lack of positive emotional experiences in his life, and he may be vulnerable to periods of anhedonia. He is likely to feel somewhat demoralized and is at increased risk for depression. He feels lacking of energy to handle the demands of his life but would find it difficult to take charge, make decisions, and get things done. He may be somewhat pessimistic and has low expectations of success.

Dr. Wells is challenged by a poor self-concept and poor self-esteem. He may feelings of ineptitude and he is overly sensitive to criticism and rejection. He would likely have difficulties making decisions. He endorses a considerable degree of anxiety. He is likely to feel nervous, anxious, and apprehensive and he may complain of sleep disturbance. He would be uncomfortable making decisions and feels somewhat hopeless. He is not finding daily life interesting or rewarding.

| BRIEF-A Self Report | | | | |
|---|---|---|---|---|
| Function | Performance Level | %ile | T Score | Raw Score |
| Negativity | Acceptable | NA | NA | 3 |
| Infrequency | Acceptable | NA | NA | 0 |
| Inconsistency | Acceptable | NA | NA | 6 |
| Behavioral Regulation Index | **Very Elevated** | 99th | T= 75 | 66 |
| Inhibit | **Very Elevated** | 99th | T= 70 | 19 |

| Shift | **Very Elevated** | >99th | T= 79 | 15 |
|---|---|---|---|---|
| Emotional Control | WNL | 92nd | T= 61 | 19 |
| Self-Monitor | **Elevated** | 98th | T= 69 | 13 |
| Metacognition Index | **Very Elevated** | >99th | T= 80 | 106 |
| Initiate | **Very Elevated** | >99th | T= 83 | 21 |
| Working Memory | **Very Elevated** | >99th | T= 97 | 24 |
| Plan/Organize | **Very Elevated** | >99th | T= 79 | 24 |
| Task Monitor | **Very Elevated** | >99th | T= 76 | 14 |
| Organization of Materials | **Very Elevated** | >99th | T= 83 | 23 |

**Summary of Self-Report Executive Functioning Measures**: Dr. Wells was administered the BRIEF-A to assess his view of his own executive functions and self-regulation in his daily environment. The BRIEF-A include several indices of test-taking approach and overall test validity. *Results indicated that he approached the questionnaire in an open and honest manner, and results may be taken as a valid reflection of his own self-perception.*

Dr. Wells tests as having difficulties maintaining appropriate regulatory control of his behavior and emotional responses. He endorsed severe problems inhibiting, resisting, or not acting on impulse and severe problems stopping his own behavior at the appropriate time. This can be reflective of the underlying deficit in executive function. He may frequently exhibit disinhibited behavior. He may interrupt or disrupt group activities. He also endorsed severe problems being able to move freely from one situation activity or aspect of a problem to another as the circumstances demand. He would have problems making transitions, problem-solving flexibly, and switching or alternating attention and changing focus from one mindset to another. Confronting changes in normal routine are likely to elicit repetitive increase about what is going to happen or when an expected postponed event will occur. He may react with anger, anxiety, or emotional outbursts. Deficits in his ability to cognitively shift will compromise the efficiency of problem-solving and may be reflected in perseverative problem-solving behaviors. He may be seen as being stubborn, rigid, or inflexible in his thinking and having difficulties generating ideas or problem-solving. There may be a lack of flexibility or creativity in problem-solving. Difficulties with self-monitoring were also reported. Dr. Wells reports having difficulties keeping track of his own behavior and the effects of his behavior on others. He may fail to appreciate or having awareness of his own social behavior and the effect that this can have on others.

Dr. Wells also endorsed severe problems in his metacognition namely with regard to solving problems via planning and organizing while sustaining those task completion efforts in his active working memory. He endorses severe problems problem-solving actively in a variety of contexts and cognitively managing his attention and problem-solving. Severe problems were noted with regards to initiation or beginning task or activities and independently generating ideas, responses, or problem-solving strategies. This does not reflect non-compliance or disinterest but rather an inability to get started. He would report difficulties with getting started on tasks or chores along with the need for extensive prompts or cues in order to begin a task or activity. This may be seen on word and design fluency tasks as well as a need for additional cues from the examiner in order to begin test in general. He endorses severe problems with working memory namely actively holding information in his mind for the purpose of completing a task or generating a response. He would have trouble remembering things even for a few minutes but would lose track of what he is doing as he works or forget what he is supposed to retrieve when instructed. He would lose track of situational demands and struggle with implementing required

activity sequences. He would also have problems sustaining attention and performance over time. This would involve problem sticking to an activity for an age-appropriate amount of time. Planning and organizing were endorsed as severely impaired. This relates to his ability to anticipate future events, implement instructions or goals, and developing appropriate steps ahead of time to carry out a task or activity. He would have problems setting a goal and strategically selecting the most effective method or steps to obtain that goal. With regard to organization, Dr. Wells endorsed problems bringing order to information, actions, or materials to achieve an objective. He is likely to approach tasks in a haphazard fashion or become easily overwhelmed by large amounts of information or actions. He may have difficulty maintaining order in his environment or personal belongings. Similarly, the organization of his everyday environment is likely to be poor, especially with respect to orderliness of work, living in storage spaces. He is likely to have difficulties keeping track of organizing and cleaning up his personal belongings. He is likely to have problems functioning effectively at work or at home because he would misplace needed objects or would not have belongings readily available for his use. Finally, the patient reported problems in being able to keep track of his own problem-solving success or failure. He may fail to appreciate or have an awareness of his own errors during activities such as problem-solving.

*Of note, the patient's report on the BRIEF-A was consistent with objective findings on neuropsychological testing.*

| ADHD Self-Report – BBARS-IV | | | | |
|---|---|---|---|---|
| **Current Symptoms** | | | | |
| Scale | | Performance Level | Percentile | Raw Score |
| Inattention | Total Score | **Very Elevated** | >99th | 30 |
| | Symptom Count | **Very Elevated** | >99th | 8 |
| Hyperactivity | Total Score | Borderline Elevate4d | 94th | 11 |
| | Symptom Count | WNL | 91st | 2 |
| Impulsivity | Total Score | **Elevated** | 95th | 9 |
| | Symptom Count | NA | NA | 1 |
| Hyperactivity-Impulsivity | Total Symptom Count | **Elevated** | 95th | 3 |
| Sluggish | Total Score | WNL | 93rd | 23 |
| Cognitive Tempo | Symptom Count | WNL | 92nd | 4 |
| **Total ADHD Score** | | **Elevated** | **98th** | 50 |
| **Childhood Symptoms** | | | | |
| Inattention | Total Score | **Elevated** | 97th | 26 |
| | Symptom Count | Borderline Elevated | 94th | 5 |
| Hyperactivity-Impulsivity | Total Score | **Very Elevated** | 99th | 28 |
| | Symptom Count | **Elevated** | **98th** | 7 |
| Total ADHD | Total Score | **Elevated** | **98th** | 54 |
| | Total Symptom Count | **Elevated** | **98th** | 12 |

**Summary of ADHD Self-Report Measures**: Dr. Wells was also administered the BAARS-IV to assess symptoms of ADHD in his daily life activities. The BAARS-IV is an empirically developed scale based upon the diagnostic criteria for ADHD and the research behind that criteria. *Dr. Wells endorsed current severe problems with inattention, including having difficulty following through on instructions, difficulty organizing tasks and activities, being easily distracted and being reluctant to engage in tasks that require sustained attention.* He endorsed forgetfulness in daily activities. Modest impulsivity was noted, limited to problems waiting his turn. Dr. Well also endorsed frequent problems processing information as quickly or as accurately as others.

*The BAARS-IV also assesses symptoms of ADHD in adolescence. Based upon his recollection, Dr. Wells endorsed severe problems in adolescence with hyperactivity, impulsivity, and inattention.*

*Woodcock-Johnson IV Tests of Achievement Form A and Extended (Norms based on age 44-9)*

## TABLE OF SCORES

*Woodcock-Johnson IV Tests of Achievement Form A and Extended (Norms based on age 44-9)*

| CLUSTER/Test | W | AE | RPI | SS (68% Band) |
|---|---|---|---|---|
| READING | 545 | >30 | 96/90 | 107 (102-112) |
| BROAD READING | 550 | >30 | 96/90 | 106 (103-110) |
| MATHEMATICS | 536 | >23 | 96/90 | 107 (104-110) |
| BROAD MATHEMATICS | 547 | >30 | 98/90 | 111 (108-113) |
| MATH CALCULATION SKILLS | 554 | >30 | 99/90 | 113 (110-116) |
| WRITTEN LANGUAGE | 540 | >30 | 97/90 | 112 (109-116) |
| BROAD WRITTEN LANGUAGE | 533 | >30 | 96/90 | 111 (108-115) |
| WRITTEN EXPRESSION | 522 | >30 | 94/90 | 108 (103-112) |
| ACADEMIC SKILLS | 554 | >30 | 99/90 | 115 (111-118) |
| ACADEMIC FLUENCY | 548 | >30 | 97/90 | 109 (106-112) |
| ACADEMIC APPLICATIONS | 527 | >30 | 92/90 | 102 (99-105) |
| BRIEF ACHIEVEMENT | 551 | >30 | 98/90 | 113 (110-117) |
| BROAD ACHIEVEMENT | 543 | >30 | 97/90 | 110 (108-112) |
| | | | | |
| Letter-Word Identification | 567 | >30 | 99/90 | 118 (110-125) |
| Applied Problems | 531 | >30 | 94/90 | 104 (100-109) |
| Spelling | 555 | >30 | 98/90 | 113 (109-118) |
| **Passage Comprehension** | 524 | 18-0 | 81/90 | 96 (92-99) |
| Calculation | 541 | >21 | 97/90 | 109 (105-113) |
| Writing Samples | 525 | >30 | 95/90 | 108 (103-113) |
| Sentence Reading Fluency | 559 | >30 | 96/90 | 104 (100-109) |

| **CLUSTER/Test** | **W** | **AE** | **RPI** | **SS (68% Band)** |
|---|---|---|---|---|
| Math Facts Fluency | 568 | >30 | 99/90 | 115 (111-119) |
| Sentence Writing Fluency | 518 | >30 | 93/90 | 105 (99-111) |

| | | STANDARD SCORES | | DISCREPANCY | | Interpretation at |
|---|---|---|---|---|---|---|
| VARIATIONS | Actual | Predicted | Difference | PR | SD | + or - 1.50 SD (SEE) |
| **Intra-Achievement [Extended] Variations** | | | | | | |
| MATH CALCULATION SKILLS | 113 | 107 | 6 | 75 | +0.68 | -- |
| WRITTEN EXPRESSION | 108 | 107 | 1 | 52 | +0.06 | -- |
| Letter-Word Identification | 118 | 106 | 12 | 92 | +1.37 | -- |
| Applied Problems | 104 | 108 | -4 | 36 | -0.37 | -- |
| Spelling | 113 | 106 | 7 | 77 | +0.73 | -- |
| **Passage Comprehension** | **96** | **110** | **-14** | **7** | **-1.45** | -- |
| Calculation | 109 | 107 | 2 | 61 | +0.28 | -- |
| Writing Samples | 108 | 106 | 2 | 55 | +0.12 | -- |
| Sentence Reading Fluency | 104 | 108 | -4 | 37 | -0.33 | -- |
| Math Facts Fluency | 115 | 105 | 10 | 79 | +0.80 | -- |
| Sentence Writing Fluency | 105 | 106 | -1 | 48 | -0.06 | -- |

| **ACADEMIC FUNCTIONING** | | | | | |
|---|---|---|---|---|---|
| **Function** | **Test** | **Performance Level** | **%ile** | **Standard Score** | **Raw Score** |
| Single Word Vocabulary | Nelson Denny Reading Test Vocabulary | High Average; GE = 18.2 | 77th | 247 | 74 |
| Reading Comprehension | Nelson Denny Comprehension – standard time | Low Average; GE = 13.7 | 20th | 213 | 52 |
| | Nelson Denny Comprehension – extended time | Low Average; GE = 14.0 | 22nd | 215 | 64 |
| Reading and Word Knowledge | Nelson Denny Reading Test Total score – standard condition | Average | 41st | 233 | 126 |
| Reading Speed | Nelson Denny Reading Test – Reading Rate | Low Average | 14th | 188 | 79 |

**Summary of Academic Functioning Measures**: Dr. Wells was administered the Woodcock-Johnson – Tests of Achievement – IV as well as the Nelson-Denny Reading Test under both standard and extended time conditions to assess his academic abilities and function. Scores were generally consistent with his demonstrated intelligence. *However, Dr. Wells had a relative weakness with regard to reading comprehension.* This was observed on the Woodcock-

Johnson – Tests of Achievement-IV, where his untimed reading comprehension skills were in the Low Average range and at the 7th percentile, as well as on the reading comprehension on test of the Nelson-Denny Reading Test, where his reading comprehension abilities even with extended time were only modestly stronger and still in the Low Average range (22nd percentile). It is interesting as well that time plus one half extended time did not significantly improve that reading comprehension weakness on the Nelson-Denny. *His reading rate was also quite poor and well below expectation given his estimated premorbid level of ability and his demonstrated intelligence.* Dr. Wells' vocabulary development was consistent with IQ testing. Math calculation skills and single word identification were strong. Writing was consistent with demonstrated intelligence.

## SUMMARY AND IMPRESSIONS:

Dr. Cornell Wells is a 44-year-old, single, right-handed, African-American male, board certified psychiatrist, with a lifelong history of performance difficulties in the academic, work and home environments. He was born very premature at a low birth weight. He was required to repeat the first grade and needed special assistance to learn to read phonetically. Throughout his life he has struggled with reading comprehension, and he has avoided reading books in their entirety. He forces himself to read out loud in order to better comprehend or understand the material, and he may need to read materials two or three times. He has a repeated history of inability to complete tasks in a timely fashion in part because of his need to reread information as well as difficulties assimilating information so as to understand and to provide cogent responses and answers. This was true in high school as well as college, medical school, and on all standardized examinations. Focus has been an issue in lectures, with tendencies to "zone out." He has particular difficulties with organization and distractibility, resulting in problems managing daily responsibilities. Yet, throughout his life there has also been repeated evidence of considerable talent, first with being awarded full scholarships to study with the National Symphony Orchestra and then at the conservatory in San Francisco. He has received international and monetary awards for his research work during his undergraduate years. He was accepted to rather prestigious programs at Stanford and the Albert Einstein College of Medicine. His success to date has been the result of talent, intellect, dedication, patience, and an exceedingly large amount of time devoted to his studies and endeavors. Dr. Wells previously has been diagnosed with a learning disability and ADHD, but formal testing has been limited.

Overall, Dr. Wells cognitive abilities generally should be in the high average to above average range (based on estimated "premorbid" levels of ability which would exclude the adverse impact of brain injury). Currently, on a comprehensive neuropsychological test battery in which he put forth full effort, there are areas of particular impairment for him. *His overall intellectual abilities are significantly below expectation given estimated levels of function.* Crystallized verbal knowledge and reasoning skills are strong, consistent with previous evaluations. His speed of thinking is in the average range. *On tests of attention and concentration, the patient does not show difficulties with vigilance or sustained attention for simple information, but he has weaknesses with regard to visual attention and visual scanning. It is noteworthy that he tends to score more poorly on tests with a timed component, even with regard to orally presented information.* On tests of language, the patient shows adequate semantic fluency and naming skills, and his vocabulary development is quite strong. *However, Dr. Wells has particular difficulties with phonetic word generation, and his oral comprehension is especially weak. On a timed tests involving rapid reading and visual scanning, he performs especially poorly. Weaknesses are also noted in the area of visual-perceptual abilities, including spatial awareness and organization, attention to visual detail, and visual construction.* Dr. Wells tends to overlook subtle visual details, and he may fail to appreciate the errors that he makes. On tests

of learning and memory, the patient is vulnerable to being overwhelmed by large amounts of information presented at once, but he does benefit from repetition of the material. His visual-spatial deficits impair his ability to accurately recall what he has seen, though his recognition of such material appears intact. *The current testing reflects difficulties with learning as opposed to retention and recall. More severe impairments are documented in the area of higher-order executive functioning.* Although Dr. Wells' reasoning is strong, and although he can manage multiple tasks simultaneously, he has particular difficulties with initiation and fluency. He has particular deficits with regards to problem-solving and planning. *This patient can solve tasks and problems that are put in front of him, but he requires a much longer amount of time than his peers, and he takes an exceedingly large number of steps or actions to be able to execute those plans and solve those problems. He is very inefficient in his approach.* Psychological testing characterizes this patient as anxious, depressed and demoralized. He struggles with feeling good about himself as well as being hopeful about the future. He is lacking positive emotional experiences in his life. *On self-report measures, Dr. Wells endorses considerable problems with higher-order executive functioning as manifested in his daily life, and the areas endorsed are consistent with the areas of weakness on formal neuropsychological testing, especially with regard to planning, organizing, monitoring his behavior, initiating activities, and maintaining information in his working memory.* He also complains of difficulties shifting from one task or idea to another. The patient endorses symptoms of inattention and impulsivity, both currently and when he was an adolescent. *Academic testing reflects weakness with regard to reading comprehension, and his weakness in this area is statistically significantly weaker in comparison with both his estimated IQ and his estimated premorbid level of ability.* This is true on both untimed and timed tests. *It is also noteworthy that time plus one-half does not allow for a significant improvement in his understanding of what he reads, and his reading rate is especially slow for someone of his intellectual caliber.*

*On the basis of Dr. Wells' history, presentation, and neuropsychological test results, he appears to be suffering from neurodevelopmental impairment secondary to his history of being a low birth weight and preterm baby.* As explained earlier in this report, PT/VLBW individuals have been shown to have particular impairments in visual-spatial abilities, spatial processing, and executive functioning. These are the areas of most profound impairment for this patient. PT/VLBW individuals are not uncommonly diagnosed with learning disabilities and attention deficit disorder, despite not necessarily demonstrating typical neurocognitive signs of ADHD. Again, this is true of this patient. As documented in the literature review section of this report, it also has been shown that low birth weight and preterm infants are vulnerable to difficulties with reading comprehension, which may be a function of their deficits in executive functioning and visuospatial abilities. Namely, adequate reading comprehension depends on other skills beyond simple word decoding, including higher-order executive functioning abilities, including planning, organizing, monitoring, and working memory, in addition to the ability to integrate nonverbal information into the meaning of the written text. Namely, PT/VLBW individuals with executive functioning impairments may be able to read fluently but they may not understand what they read, and this deficit becomes more pronounced as the complexity of the material increases. This also is reflected in Dr. Wells' current exam results. Namely, Dr. Wells can read simple sentences quickly and accurately (WJ-IV Reading Fluency), but he has greater difficulty when required to quickly read and comprehend longer passages (WJ-IV Passage Comprehension, Nelson Denny Reading Test Comprehension subtest). The research literature shows that executive control skills such as planning and working memory become more necessary with regard to reading comprehension, as the length and complexity of written test increases. Interestingly, individuals who struggle with reading comprehension tend to perform more poorly than typically developing peers on measures requiring planning and organized response, areas also shown to be particularly deficient in VP/VLBW individuals. All of these findings are completely consistent with Dr.

Wells' complaints, his documented history, and with his current neuropsychological test results. Furthermore, Dr. Wells appears to have this problem with comprehension not only with regard to reading, but also with regard to oral presentation. This would help to explain why Dr. Wells has been able to succeed as much as he has and yet suffer the repeated failures he has throughout his history.

*Dr. Wells does warrant diagnosis of ADHD, predominantly inattentive type.* His inattention is manifested with both visual material and orally presented verbal material, especially with more complex material. He is especially vulnerable to initiation problems because of his executive dysfunction, as seen in his poor verbal and nonverbal fluency. This is a core feature of ADHD. He is able to perform adequately on a computerized continuous performance test, but that test did not compare him to peers with his level of educational achievement or his estimated premorbid level of ability. Furthermore, as indicated, the research literature shows that recognition of single letters does not tap into the same executive functions necessary for perception or for concentration on complex wording, statements, and lectures. The current testing clearly shows his weakness in visuoperception and visual attention. *Similarly, Dr. Wells' reading comprehension skills warrant diagnosis of a specific learning disorder with impairment in reading comprehension.* There is a significant discrepancy between his verbal intelligence/premorbid functioning and his reading speed/reading comprehension (comparison between reading speed and reading comprehension with overall IQ is not appropriate because of the deflation in the score secondary to his visuoperceptual deficits). Although Dr. Wells has a strong enough verbal knowledge and intelligence to be able to understand what he reads and to communicate, it takes him a much longer period of time to be able to achieve that understanding that it typically would for someone of his intellect and talent, and this becomes much more pronounced as the complexity of the material (such as board examinations) increases. Being able to read idiosyncratic simple sentences or single words accurately does not negate the presence of a neurodevelopmental learning disability. This patient's type of reading disability appears primarily to be a function of his frontal systems integrity, and, thus, single word pronunciation or recognition would not be anticipated to be, and in his case is not, significantly impacted. Dr. Wells would further warrant diagnosis of an auditory processing disorder, though this is not an accepted diagnosis under the DSM-V, because of the difficulty distinguishing it from ADHD. His oral comprehension problems, though, are clearly reflected in receptive language testing. It also more accurately accounts for the difficulties he has understanding what he hears, especially during long discourse or lectures.

Dr. Wells problems, though, extend beyond just ADHD, a learning disorder, and an auditory processing disorder, In and of themselves, these diagnoses are too simplistic to fully explain the nature of the patient's cognitive impairments. *Rather, fundamentally, Dr. Wells presents as having a neurodevelopmental disorder associated with preterm birth and low birth weight, with permanent impairments in his language, attention, visuoperception, and executive functioning abilities.* It is not as though his deficits have been able to escape detection. When the complexity and difficulty of his work increased, Dr. Wells began to struggle in school, and he has continued to struggle since that time. His deficits were assessed and diagnosed back in 2000 and again in 2010. Those evaluators may not have had an understanding of the neurodevelopment of PT/VLBW individuals, but they clearly observed Dr. Wells' problems in academics and overall functioning. They correctly diagnosed him with a learning disorder and ADHD, but they failed to see the entire picture of this case. That does not dismiss the accuracy of their conclusions that Dr. Wells is unduly hindered in situations such as standardized examinations because of his neurodevelopmental deficits. They just didn't have a clear conceptualization of why he was presenting with the problems he had, because their testing did not include a comprehensive assessment.

Individuals with ADHD and/or learning disabilities and PT/VLBW are vulnerable to developing clinical anxiety and depressive disorders. In part, their emotional problems are a reaction to the challenges they face and the failures they repeatedly experience, as well as the tendencies they have to blame themselves for their predicament. This appears to be true with Dr. Wells. Although depression and anxiety can impact cognition, the effect size of that impact is generally rather small. Furthermore, anxiety and depression cannot account for the pattern of performances on the current neuropsychological test battery, with poor comprehension, impaired visuospatial abilities, and considerably impaired aspects of executive functioning. Thus, this is not to ignore the fact that Dr. Wells has been battling emotional issues, but those conditions are a consequence and not a cause of his cognitive dysfunction.

The patient's neurodevelopmental disorder renders him disabled under the Federal Americans with Disabilities Act. He would warrant accommodations in all testing situations, especially those with complex reading comprehension, integration, and analysis components. This patient would require at least double time for all formal tests in addition to double the standard number of breaks. He would warrant a private examination room to reduce any and all distractions. Although stimulant medications have been shown to help with focus, given Dr. Wells' hypertensive condition, use of stimulant medications may be contraindicated. Furthermore, stimulant medications cannot mask or compensate for the executive functioning deficits, which are fundamental to the patient's condition. Should Dr. Wells ever choose to return to school or when he completes continuing education requirements, he would warrant a scribe to assist with notetaking or receipt of notes from the instructor or presenter, because, as noted, Dr. Wells struggles with processing information as it is presented to him, and he is vulnerable to missing a significant amount of information imparted to him. These dispensations are not meant to provide Dr. Wells any unfair advantage over his peers, but rather only level the playing field, so to speak, so that he can adequately demonstrate his knowledge and skills.

## DSM-5 DIAGNOSTIC IMPRESSIONS:
F88 Neurodevelopmental disorder associated with preterm birth and very low birth weight
F90.0 Attention Deficit Hyperactivity Disorder Predominantly Inattentive Type
F81.0 Specific Learning Disorder with impairment in reading (reading comprehension)
F41.9 Anxiety Disorder Unspecified
F33.41 Major Depressive Disorder, recurrent, in partial remission
Auditory Processing Disorder

Thank you for the opportunity to participate in the care of this patient. If you have any questions regarding this evaluation or report or if I could be of any other assistance, please do not hesitate to contact me.

Annette Swain, Ph.D ABCN

Annette Swain, Ph.D., ABPP-CN
CA PSY16330
Board Certified, American Academy of Clinical Neuropsychology
Board Certified, American Academy of Clinical Psychology
Associate Clinical Professor, UCLA Department of Psychology
Qualified Medical Evaluator, State of California

## APPENDIX

Aarnoudse-Moens, C.S., Smidts, D.P., Oosterlaan J. et al. (2009). Executive function in very preterm children at early school age. Journal of Abnormal Child Psychology, 37, 981-993.

Aarnoudse-Moens, C.S., Weisglas-Kuperus, N. van Goudoever, J.B., et al. (2009). Meta-analysis of neurobehavioral outcomes in very preterm and/or very low birthweight children. Pediatrics, 124, 717-728.

Allen, M.C., Cristfalo, E., & Kim. C. (2010). Preterm: Transition to Adulthood. Developmental Disabilities Research Reviews, 16, 323-335.

Bhutta, A.T., Cleves, M.A., Casey, P.H., et al. (2002). Cognitive and behavioral outcomes of school-aged children who were born pre-term: a meta-analysis. JAMA, 288, 728-737.

Breeman, L.D. Jaekel, J., Baumann, N et al. (2015). Preterm Cognitive Function into Adulthood. Pediatrics, 136, 415-423.

Corcoles-Parada, M., Gimenez-Mateo, R., Serrano-del-Pueblo, et al. (2019). Born too early and too small: Higher order cognitive function and brain at risk at ages 8-16. Frontiers in Psychology, 10, 1-14.

Farooqi, A. Hagglof, B., Sedin, G., et al. (2006). Chronic conditions, functional limitations, and special health care needs in 10- to 12-year-old children born at 23 to 25 weeks' gestation in the 1990s: a Swedish national prospective follow-up study. Pediatrics, 118, 1466-1477.

Gimenez, M. Junque, C., Narberhaus, A. et al. (2006). Correlations of thalamic reductions with verbal fluency impairment in those born prematurely. Neuroreport, 17, 463-466.

Hilman, L.S., Day, L.S, Hoffman, H.J et al., (2019). Poorer outcomes of all low birth weight groups at age 10: Missouri statewide case-control study. Early Human Development, 136, 60-69.

Idredavik, M.S., Vik, T., Heyerdahl, S. et al., (2004). Psychiatric symptoms and disorders in adolescents with low birth weight. Archives of Disease in Childhood Fetal and Neonatal Edition, 89, F445-F450. '

Jaekel, J., Baumann, N., & Wolke, D. (2013). Effects of gestational age at birth on cognitive performance: A function of cognitive workload demands. PLoS ONE, 8, e65219.

Lohaugen, G.C., Gramstad, A., Evensen, K.A. et al. (2010). Cognitive profile in young adults born preterm at very low birthweight. Developmental Medicine and Child Neurology, 52, 1133-1138.

Luu, T.M., Ment, L.R., Schneider, K.C., et al., (2009a). Lasting effects of preterm birth and neonatal brain hemorrhage at 12 years of age. Pediatrics, 127, 1037-1044.

Luu, T.M. Vohr, B.R., Schneider K.C. et al. (2009b). Trajectories of receptive language development from 3 to 12 years of age for very preterm children. Pediatrics, 124, 333-341.

Madzwamuse, S. E., Baumann, N., Jackel, J, Bartmann, P., & Wolke, D. (2015). Neuro-cognitive performance of very preterm or very low birth weight adults at 26 years. Journal of Child Psychology and Psychiatry, 56, 857-864.

Mulder, H., Pitchford, N.J., Hagger M.S., et al. (2009). Development of executive function and attention in preterm children: A systemic review. Developmental Neuropsychology, 34, 393-421.
Nosarti, C., Giouroukou, E., Healy, E., et al., (2008). Grey and white matter distribution in very preterm adolescents mediates neurodevelopmental outcome. Brain, 131, 205-217.

Nosarti, C., Giouroukou E., Micalie, N. et al. (2007). Impaired executive functioning in young adults born very preterm. Journal of the International Neuropsychological Society, 13, 571-581.

Novais-Santos, S., Geej. J., Shah, M., Troiani, V., Work, M, & Grossman, M. (2007). Resolving sentence ambiguity with planning and working memory resources. Evidence from fMRI. NeuroImage, 37, 361-378.

Pyhala, R., Lahti, J., Heinonen, K. et al. (2011). Neurocognitive abilities in young adults with very low birth weight. Neurology, 77, 2052-2060.

Reiter, A., Tucha, O., & Lange K.W., (2005). Executive functions in children with dyslexia. Dyslexia, 11, 116-131.

Rose, S.A, & Feldman J.F. (1996). Memory and processing speed in preterm children at eleven years: A comparison with full-terms. Child Development, 67, 2005-2021.

Sesma, H.W., Mahone, E.M., Levine, et al (2009). The contribution of executive skills to reading comprehension. Child Neuropsychology, 15, 232-246.

Skranes, J., Vangberg, T.R., Kusleng, S. et al. (2007). Clinical findings and white matter abnormalities seen on diffusion tensor imaging in adolescents with very low birth weight. Brain, 130, 654-666.

Skranes, J., Evensen, K.I., Lohaugen, G.C., et al. (2008). Abnormal cerebral MRI findings and neuro-impairments in very low birth weight (VLBW) adolescents. European Journal of Paediatric Neurology, 12, 273-283.

Skranes J., Logaugen, G.C., Martinussen, M., et al. (2009). White matter abnormalities and executive function in children with very low birth weight. Neuroreport, 20, 263-266.

Stothers, M., & Klein (2010). Perceptual organization, phonological awareness and reading comprehension in adults with and without learning disabilities. Annals of Dyslexia, 60, 209-237.

Strang-Karlsson, S., Raikkonen, K., Pesonen, A.K. et al (2008). Very low birth weight and behavioral symptoms of attention deficit hyperactivity disorder in young adulthood: The Helsinki study of very low birthweight adults. American Journal of Psychiatry, 165, 1345-1353.

Stjernqvist, K., & Svenningsen, N. W. (1999). Ten-year follow-up of children born before 29 gestational weeks: health, cognitive development, behaviour and school achievement. Acta Paediatr, 88, 557-562.

# EXHIBIT "B"

### Wells v. National Board of Medical Examiners, et al.

 National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

July 9, 2019

Cornell Wells

RE: USMLE Step 3 USMLE ID#:

Dear Dr. Wells:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 3. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be Attention-Deficit/Hyperactivity Disorder (ADHD) diagnosed in 2010. In your personal statement you write, "*The peak of my academic and cognitive struggles occurred in medical school, however, when my compensation strategies of working longer and harder than everyone else seemed to fail. I struggled to maintain focus to read voluminous amounts of material, synthesizing/integrating complex systems of knowledge, and with organization and communication of salient details. These deficiencies impaired me on timed, multiple choice exams as well as on various clerkships…I failed a number of exams including NBME exams and Step 2 CK, which resulted in me being placed on academic probation and up for dismissal from medical school. I was baffled by the idea that despite my best efforts and arduous studying, that I was at the brink of losing everything that I had sacrificed and worked hard for over many years. My medical school dean required I undergo psychoeducational testing in my 3rd year to explore what may be causing my struggles. After I was formally diagnosed with ADHD, I received ADA testing accommodations for the remainder of my tenure and was able to successfully graduate.*"

In a December 2010 Psychoeducational Evaluation Report conducted when you were a 35-year-old third year medical student, Mary Kelly, Ph.D. writes that you have "*had excessive exam failures*" and would like a "*better understanding of the problems he experiences.*" Dr. Kelly discusses your performance in medical school writing, "*Mr. Wells is now at Einstein. He has failed seven exams at Einstein. He had two or three surgeries during his first year, and subsequently failed three exams. He took some time off and decelerated in Year 2…Mr. Wells is doing clerkships at this time. He failed his first two Shelf exams, in family medicine and pediatrics. He was unable to complete the pediatrics exam in the time limit.*" Your evaluator concludes, "*Mr. Wells was referred by Dean Katz of Einstein. He has a history of problems with attention, memory, and test taking…Current testing indicates that Mr. Wells is functioning within the overall average range of intelligence…Mr. Well's basic reading and spelling skills are well developed. He had some difficulty with a reading comprehension task and a listening comprehension task. During the listening comprehension task he had difficulty sustaining appropriate attention. Attention may have also affected his performance on the reading comprehension task.*" Your evaluator assigns the diagnosis of ADHD, Combined Type and she

recommends that you "*be permitted to take tests in a private location with extended time. Time and a half would be appropriate.*"

The diagnostic conclusions and recommendations of your evaluator notwithstanding, your 2010 performances on a range of cognitive and academic tasks, including Working Memory, cognitive Processing Speed, Reading Fluency, Oral Comprehension, and Passage Comprehension, are all within the range of Average functioning and not indicative of impairment.

As you may know, ADHD is a neurodevelopmental disorder that begins in childhood. Even if not formally diagnosed in childhood, the essential feature of ADHD is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development. ADHD usually results in a long history of chronic impairment and the diagnosis affects people over time and across situations, not in one circumscribed area such as timed test taking or in a demanding academic setting such as medical school. According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, manifestation of the disorder must be present in more than one setting (e.g., home and school, work). It needs to be documented beyond self-report that symptoms have consistently and pervasively disrupted functioning over time in multiple behavioral domains. Your documentation does not reflect a record of chronic and pervasive problems managing daily demands for attention, concentration, or organization that has substantially impacted your functioning in school, work, social, or other domains.

As best one can tell, you progressed throughout your education with an academic record and scores on timed standardized tests sufficient to gain admission to and graduate from college, earn a master's degree, and matriculate and complete at least two years of medical school, all without formal accommodations. Regarding your performances on timed standardized tests, our records show that you successfully completed USMLE Step 1, Step 2 CK, and Step 2 CS under standard testing conditions. Taken altogether, the documentation provided does not demonstrate impaired functioning relative to most people or that standard test timing is a barrier to your access to Step 3.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 3 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise the Federation of State Medical Boards (FSMB) Assessment Services to process your exam application without test accommodations. You may inquire at usmlereg@fsmb.org or call FSMB Assessment Services directly at (817) 868-4041 with any questions about your scheduling permit.

Sincerely,
*Lucia McGeehan*
Lucia McGeehan, Ph.D.
Disability Assessment Analyst, Disability Services

# EXHIBIT "C"

### Wells v. National Board of Medical Examiners, et al.

# MelrosePsych

## Gerald M. Baltz, DNP, PMHNP-BC

8060 Melrose Ave., Ste 200 | Los Angeles, CA 90046 | 323.391.4830 | drjay@melrosepsych.com

July 20, 2019

Dear Ms. Cohen:

My name is Dr. Gerald Baltz. I am a board certified psychiatric nurse practitioner with over 10 years of experience. I have been treating Cornell Wells for Attention-Deficit Hyperactivity Disorder, primarily inattentive presentation (ADHD) since May 2019. I have reviewed his full history, including the psychometric testing conducted by clinical psychologist Mary H. Kelly, Ph.D. on December 3rd and 9th, 2010. Based on my own findings and on his prior records, I can definitively state that Dr. Wells carries a diagnosis of ADHD, primarily inattentive presentation, and has carried this diagnosis since childhood.

I have listed the criteria for ADHD as defined by the DSM-V, *bolding the pertinent symptoms suffered by Dr. Wells.* I will then expound upon his symptoms with examples.

ADHD is defined as:

A. A "persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development, as characterized by (1) **and/or** (2):

1. Inattention: Six or more (5 or more for adults 17 and older) of the following symptoms have persisted for at least 6 months to a degree that is consistent with developmental level and that negatively impacts directly on social and academic/occupational activities.
   a. **Often fails to give close attention to details or makes careless mistakes in schoolwork, at work, or during other activities**
   b. **Often has difficulty sustaining attention in tasks or play activities**
   c. Often does not seem to listen when spoken to directly
   d. **Often does not seem to listen when spoken to directly**
   e. **Often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace**
   f. **Often has difficulty organizing tasks and activities**
   g. **Often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort**
   h. **Often loses things necessary for tasks or activities**
   i. **Is often easily distracted by extraneous stimuli**
   j. **Is often forgetful in daily activities**
2. Hyperactivity and Impulsivity: Six or more (5 or more for adults 17 and older) of the following symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities:
   a. **Often fidgets with or taps hand or feet or squirms**

    b.  Often leaves seat in situations when remaining seated is expected
    c.  Often runs about or climbs in situations where it is inapprorirate
    d.  Often unable to play or engage in leisure activities quietly
    e.  Is often "on the go," acting as if "driven by a motor)
    **f.  Often talks excessively**
    **g.  Often blurts out an answer before a question has been completed**
    h.  Often has difficulty waiting his or her turn
    i.  Often interrupts or intrudes on others

B. **Several inattentive or hyperactive-impulsive symptoms were prior to age 12 years.**

C. **Several inattentive or hyperactive-impulsive symptoms are present in two or more settings.**

D. **There is clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning.**

E. **The symptoms do not occur exclusively during the course of schizophrenia or another psychotic disorder and are not explained by another mental disorder.**

As a child, Dr. Wells was very talkative. However, his hyperactivity was not severe enough to warrant attention, and as such, his inattentive symptoms went undiagnosed. This failure to diagnose ADHD in less hyperactive children is very common, particularly in less intensive primary schools. While he was very distractible, he was able to perform to an acceptable degree until high school. His high school was very challenging and his performance suffered. He became depressed as he watched his own progress suffer compared to his peers. He dropped out of school in his Senior year and because he was musically talented, entered the Conservatory as a cellist.

However, his problems with attention, distractibility, organization, and task management continued. Despite practicing, he did not improve. He later realized this is because he was not practicing difficult parts that would take a lot of effort; instead, he would mismanage his time and only practice when he could force himself to, and even then he would practice parts he already knew. He could not get himself to read the music and has often struggled with tasks involving reading. He could not organize or manage his time and tasks. Despite telling Dr. Wells that reading "clicked" for him at 7 years of age, her testing showed that Dr. Wells' responses were in the low average range, only improving when sentences were repeated. Eventually, he was dismissed from the Conservatory and again fell into depression.

He enrolled at a state community college and floundered until he eventually enrolled in an educational opportunity program at SFSU. This program provided academic, social, peer, tutor, and mentor support for students who wanted careers in medicine, math, and science. This support and attention allowed him to perform at a much higher level. Before he had that structure, he needed reduced loads, and afterwards, he was able to take a full course load and even make the Dean's list.

When he took the MCAT, he performed poorly and believes he was accepted to medical school due to his research and clinical experience completed during his pre-med courses. His verbal reasoning results were very weak, similar to those who do not speak English as a first language. Despite feeling confident with physical and biological sciences, he scored poorly on these sections. The MCAT did not accurately represent his fund of knowledge because he ran out of time and was unable to complete all sections. While he was able to pass Step 1, Step 2 CK, and Step 2 CS, he had to retake Step 2 due to lack of time, and in all cases, due to running out of time, his scores were low average or marginal.

His ADHD symptoms continued to plague him throughout medical school and his clerkships, as well as at home, in his social life, and while driving.

Dr. Wells particularly suffers from difficulty with visual-spatial memory. This is expounded upon in the 2010 report by Dr. Kelly, which demonstrated poor visual and spatial memory. This fact is particularly salient, because visuospatial memory results can be positively correlated with ADHD, and visuospatial working memory tasks is a sensitive predictor (from a research perspective) of ADHD versus other cognitive deficits.

Dr. Wells has struggled with symptoms of ADHD since childhood. As a child he was very chatty and distractible. He was held back in first grade. He struggled through his high school years both at home and at school, and dropped out during senior year. As an adult, Dr. Wells has difficulty sustaining focus while driving, and has had three motor vehicle accidents in the past 6 months. He will miss turns while driving because he "zones out" the GPS, and he will speed because his full attention has to be directed at the road instead of the speedometer. His friends notice that he has a lot of difficulty with attention when they are out socially, whether during conversations or while driving. He struggles to pay bills on time. He is the first to work, the last to leave, and often skips lunch to work on patient notes. He struggles to manage his time effectively. He will procrastinate paying bills, completing taxes, and writing patient notes.

His history of depression has been effectively treated over the years, and I do not believe his problems with concentration and distractibility are related to depression. Conversely, his untreated ADHD has definitely contributed to his depression over the years.

Dr. Wells has been practicing as a successful physician and psychiatrist in spite of his symptoms of ADHD due to his tenacity and intellect, but as evidenced throughout his life, the possibility of test failure due to ADHD is very real. Having to retake Step 3 without accommodations therefore presents a real problem. As Step 3 requires a lot of visuospatial memory replete with clinical cases and media, he is understandably concerned about not receiving proper accommodations for ADHD.

It is my professional opinion that Dr. Wells is entitled to, and needs, proper accommodations for his diagnosed ADHD. I have previously recommended 50% additional time and added break time, as well as a private examination room to minimize distractions. I continue to advocate for these accommodations.

If you or any others would like to further discuss these accommodations with me, I would be happy to speak with you with Dr. Wells' consent through a signed HIPAA release.

Thank you for any assistance you might provide.

Sincerely,

Gerald M. Baltz, DNP, PMHNP-BC
Doctor of Nursing Practice
Board Certified Psychiatric & Mental Health Nurse Practitioner

***EXHIBIT "D"***

***Wells v. National Board of Medical Examiners, et al.***

 **NBME®**

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

August 19, 2019

Cornell Wells

RE: USMLE Step 3                    USMLE ID#:

Dear Dr. Wells:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 3. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from providers; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

In your July 22, 2019 e-mail you write, *"Step 3 is a particular challenge for me since there is more emphasis on interpreting clinical data that is often tabulated visually, relative to steps 1 and 2. I tend to be a slow visual processor, which affects me in other activities such as reading and driving, and am particularly prone to distraction during these activities that require such sustained mental effort. However I can assure you that with the appropriate preparation, time and accommodation, I have never failed an exam. If I take Step 3 without accommodations, there is a very probable chance that I will fail despite adequate preparation...I am providing additional documentation...from my treating provider, Dr. Jay Baltz, for your review. He has summarized his clinical findings and the impact on my social, occupational function, and provided his recommendations."*

Received with your request was a July 20, 2019 letter in which Gerald M. Baltz, DNP, PMHNP-BC writes, *"I am a board certified psychiatric nurse practitioner with over 10 years of experience. I have been treating Cornell Wells for Attention-Deficit Hyperactivity Disorder, primarily inattentive presentation (ADHD) since May 2019. I have reviewed his full history, including the psychometric testing conducted by clinical psychologist Mary H. Kelly, Ph.D. on December 3rd and 9th, 2010. Based on my own findings and on his prior records, I can definitively state that Dr. Wells carries a diagnosis of ADHD, primarily inattentive presentation, and has carried this diagnosis since*

*childhood. Dr. Wells has been practicing as a successful physician and psychiatrist in spite of his symptoms of ADHD due to his tenacity and intellect, but as evidenced throughout his life, the possibility of test failure due to ADHD is very real. Having to retake Step 3 without accommodations therefore presents a real problem. As Step 3 requires a lot of visuospatial memory replete with clinical cases and media, he is understandable concerned about not receiving proper accommodations for ADHD. It is my professional opinion that Dr. Wells is entitled to, and needs proper accommodations for his diagnosed ADHD. I have previously recommended 50% additional time and added break time, as well as a private examination room to minimize distractions. I continue to advocate for these accommodations. "*

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate impaired functioning, including visual processing, compared to most people in the general population or that standard time conditions are a barrier to your access to the USMLE.

The supplemental documentation that you submitted provided no new substantive information or evidence that alters our decision communicated in our July 9, 2019 letter. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

*EXHIBIT "E"*

*Wells v. National Board of Medical Examiners, et al.*

**USMLE®**
UNITED STATES MEDICAL LICENSING EXAMINATION ®

Home | Bulletin | FAQs | Applications & Fees | Security | Step Examinations | Practice Materials | **Test Accommodations** | Scores & Transcripts | Data & Research | CRU

Introduction | Requesting Accommodations | Guidelines | Forms | Settlement with Department of Justice

# Test

# Information Regarding the Settlement with the Department of Justice

Posted: March 18, 2011

## What is the USMLE?

The USMLE is a standardized examination used to evaluate applicants' competence for purposes of medical licensure in the United States and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. USMLE is accepted by virtually all licensing boards in the US as evidence of competence to practice medicine in the US. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an important element in the process for licensing physicians. Because of the test's importance to the public's safety and to examinees, maintaining its fairness and integrity is a priority for the NBME.

## Does the USMLE program provide test accommodations for examinees with disabilities?

Yes. Pursuant to the Americans with Disabilities Act, as amended (ADA), private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to persons with disabilities. The NBME provides reasonable and appropriate test accommodations to examinees who provide supporting documentation which shows that they have a disability within the meaning of the ADA.

## What prompted the recent settlement agreement between the NBME and the Justice Department?

NBME was first contacted in October 2010 by the Department of Justice regarding Mr. Frederick Romberg's request for test accommodations. In our initial response, we explained to the Department of Justice the reasons for our decision on Mr. Romberg's request. We then worked with the Department to address its concerns regarding Mr. Romberg in a manner that was consistent with the important role that the USMLE plays in the licensure process for physicians and NBME's legitimate concerns relating to requests for accommodations that alter standard testing conditions.

## Did NBME violate the ADA?

No. The settlement agreement with the Department of Justice expressly notes that NBME "denies that it has violated the ADA in any way in its handling of Mr. Romberg's request for accommodations," and that the agreement "is not an admission by NBME of any violation of the ADA or its implementing regulations." Through the Department of Justice, NBME was provided additional documentation relating to Mr. Romberg and, in an effort to resolve the matter on mutually agreeable terms, the NBME and the Department of Justice subsequently reached an amicable resolution that addressed the concerns of each party.

## What does the settlement agreement mean for other examinees?

The agreement applies to Frederick Romberg individually and provides that he will receive extra testing time and a separate testing area on Step 1 and Step 2 CK of USMLE. With respect to other examinees, the NBME will continue to provide testing accommodations to candidates in accordance with the requirements of the ADA. Our process for determining whether to grant accommodations is rigorous but fair, and properly reflects the important role that the USMLE plays in the licensure process for physicians. If you have a physical or mental impairment that substantially limits your ability to perform a major life activity that is relevant to taking the USMLE under standard testing conditions, we encourage you to request reasonable accommodations when you take the USMLE.

## What is the process for requesting test accommodations for USMLE?

Information regarding procedures and documentation requirements for accommodation requests is available at the USMLE website. Individuals who are seeking accommodations should submit their requests and accompanying documentation when they apply for USMLE. Information about requesting test accommodations »

## What type of documentation should I submit in support of my request for testing accommodations?

Submit all documentation that you believe establishes (1) the existence of a physical or mental impairment that substantially limits one or more major life activities within the meaning of the ADA, and (2) how the impairment limits your ability to take USMLE under standard conditions. Documentation should include diagnostic assessment/evaluation report(s) by a qualified professional showing how the impairment limits one or more major life activities. NBME may make a timely request for supplemental information if the information you submit does not clearly establish the nature of your disability or the need for testing accommodations for the requested Step examination.

## Is an evaluation report from my doctor/psychologist recommending that I receive accommodations sufficient to be granted test accommodations for USMLE?

The supporting documentation that you submit from a qualified professional is a necessary part of any request and is carefully reviewed by the NBME. However, as the settlement agreement notes, NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional. We carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation. Should our review of your documentation result in denial of your request, we will explain our reasons in writing. If your documentation is insufficient to make a decision or we have other questions or concerns, you will be notified and given an opportunity to supplement your request and supporting documentation.

## I received accommodations in the past. Is that sufficient evidence of impairment to be granted test accommodations for USMLE?

The fact that you have previously received accommodations in other contexts is not, in itself, a sufficient demonstration of your need for accommodations on a USMLE examination. However, NBME gives considerable weight to documentation of prior/current accommodations. Therefore, you should provide documentation detailing all such services and accommodations that you have received in the past, including for similar testing situations. We review each request on a case-by-case basis, carefully considering all evidence in determining whether an individual is substantially limited within the meaning of the ADA and, if so, what accommodations are appropriate in the context of USMLE.

**USMLE**

Announcements | Frequently Asked Questions | Performance Data
The Comprehensive Review (CRU) | Test Accommodations | About
Contact | Privacy Policy
Download Adobe Reader

Copyright © 1996-2021 Federation of State Medical Boards (FSMB) and National Board of Medical Examiners® (NBME®). All rights reserved.
The United States Medical Licensing Examination® (USMLE®) is a joint program of the FSMB and the NBME.

## EXHIBIT "F"

### Wells v. National Board of Medical Examiners, et al.

# SETTLEMENT AGREEMENT

# BETWEEN

# UNITED STATES OF AMERICA

# AND

# NATIONAL BOARD OF MEDICAL EXAMINERS

## DJ# 202-16-181

### Press Release

This Agreement is entered into by and between the United States of America, acting through the United States Department of Justice, Civil Rights Division, Disability Rights Section (the "United States"), and the National Board of Medical Examiners ("NBME").

## BACKGROUND AND APPLICABLE LAW

1. NBME is a private, non-profit organization. Its offices and principal place of business are located in Philadelphia, Pennsylvania.

2. Together with the Federation of State Medical Boards, NBME sponsors the United States Medical Licensing Examination ("USMLE"), an examination related to licensing for professional purposes. NBME administers the USMLE. Thus, NBME is subject to the requirements of Section 309 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12189, and the implementing regulations, 28 C.F.R. § 36.309.

3. The USMLE is a standardized examination used to evaluate applicants' competence for purposes of medical licensure in the U.S. and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. The USMLE is administered at locations around the world to individuals who are attending, or have attended, medical schools in the United States and abroad. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an important element in the process for licensing physicians.

4. The United States Department of Justice (the "Department") is the federal agency responsible for administering and enforcing Title III of the ADA, 42 U.S.C. §§ 12181-12189.

5. Pursuant to Title III of the ADA, private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to persons with disabilities. 42 U.S.C. §12189 and 28 C.F.R. § 36.309.

6. Pursuant to 28 C.F.R. § 36.309, private entities that administer such examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for persons with disabilities. The purpose of testing accommodations is to ensure, in a reasonable manner, that the "examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills

are the factors that the examination purports to measure)." 28 C.F.R. § 36.309(b)(1)(i). "Required modifications to an examination may include changes in the length of time permitted for completion of the examination." 28 C.F.R. § 36.309(b)(2).

7. The auxiliary aid requirement is a flexible one. A testing entity can choose among various alternatives as long as the result is effective communication. Use of the most advanced technology is not required so long as effective communication is ensured. *See* 28 C.F.R. Part 36, App. B, at 727-728 (2010).

8. Pursuant to the Attorney General's authority under 42 U.S.C. § 12188(b)(1)(A)(i) to conduct investigations of alleged violations of Title III of the ADA, the Department investigated a complaint from Frederick Romberg, alleging that the NBME had failed to grant him reasonable testing accommodations on the basis of a disability (dyslexia) for administrations of the USMLE Step 1 examination in 2008 and 2010. Among other things, the NBME had found that the supporting documentation submitted to NBME by Romberg did not demonstrate that he is currently substantially limited in a major life activity as compared to most people , so as to be disabled within the meaning of the ADA, as amended.

9. The Department concluded that Romberg had submitted sufficient documentation to demonstrate that he is a person with a disability within the meaning of the ADA, and that he was entitled to reasonable testing accommodations to take the USMLE. NBME disputes the Department's conclusions and denies that it has violated the ADA in any way in its handling of Mr. Romberg's request for accommodations.

10. Romberg has recently provided additional documentation to the NBME in support of his request for accommodations on the USMLE Step 1 examination relating to accommodations he received in undergraduate school, graduate school, and medical school.

11. NBME and the Department have reached agreement that it is in the parties' best interests, and the Department believes it is in the public interest, to resolve this matter on mutually agreeable terms and have, therefore, agreed to enter into this Agreement.

WHEREFORE, the Department and NBME hereby agree and stipulate as follows:

# AGREEMENT TERMS

## A. General Obligations

12. NBME shall provide reasonable testing accommodations to persons with disabilities who seek to take the USMLE, in accordance with the requirements of 42 U.S.C. § 12189 and the implementing regulations, 28 C.F.R. § 36.309.

13. NBME's requests for documentation shall be reasonable and limited to documentation that establishes (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions. *See* 28 C.F.R. Part 36, App. B, at 737 (2010).

14. NBME will carefully consider the recommendation of qualified professionals who have personally observed the applicant in a clinical setting and have determined -- in their clinical judgment and in accordance with generally accepted diagnostic criteria, as supported by reasonable documentation -- that the individual is substantially limited in one or more major life activities within the meaning of the

Case 3:21-cv-01270-JSC Document 1 Filed 02/23/21 Page 47 of 56

ADA and needs the requested test accommodations in order to demonstrate his or her ability and achievement level.

15. NBME will carefully consider all evidence indicating whether an individual's ability to read is substantially limited within the meaning of the ADA, including the extent to which it is restricted as to the conditions, manner, or duration as compared to the reading ability of most people.

16. In determining whether to grant a request for testing modifications or accommodations for an individual who did not receive a diagnosis of a reading disability until later in his or her life, NBME shall consider bona fide, reasonably supported reasons for the late diagnosis as well as academic records and other objective evidence relating to the individual's reading ability.

17. NBME has a right to make a timely request for supplemental information if the information submitted by an applicant does not clearly establish the nature of the disability or the need for reasonable testing accommodations, and the request is consistent with the requirements of Paragraph 13. NBME also has the right to have the information submitted by or on behalf of an applicant reviewed by one or more qualified professionals of NBME's choosing at NBME's request and expense. NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional but it must provide an explanation for declining to accept those conclusions or recommendations.

18. NBME is not required to provide testing accommodations that would fundamentally alter what the USMLE is intended to test, jeopardize exam security, or in the case of auxiliary aids and services, result in an undue burden.

19. If it is not doing so already, NBME will comply with the following requirements of the implementing regulations set forth at 28 C.F.R. § 36.309(b)(1) once they become effective on March 15, 2011:

    (iv) Any request for documentation, if such documentation is required, [will be] reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

    (v) When considering requests for modifications, accommodations, or auxiliary aids or services, the entity [will] give[] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred as a Section 504 Plan).

    (vi) The entity [will] respond[] in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

## B. Testing Accommodations for Frederick Romberg

20. NBME will grant Frederick Romberg the accommodation of double the standard testing time and a separate testing area when he takes the Step 1 and Step 2 CK examinations. The testing for Step 1 and Step 2 CK shall be accomplished in accordance with a reasonable schedule. Actual testing time shall not exceed eight (8) hours per day.

21. Romberg will be subject to all standard requirements for registering to take the Step 1 and Step 2 CK examinations and scheduling his examinations.

22. Except for the accommodations provided herein, the USMLE Step 1 and Step 2 CK examinations will be administered to Romberg under the same conditions as those afforded examinees who do not receive accommodations. Romberg's scores on the Step 1 and Step 2 CK examinations will be reported in the same manner as are scores of other examinees who receive accommodations on the USMLE.

## C. Miscellaneous

23. Compliance Review and Enforcement. Throughout the term of this Agreement the Department may, at any time, review compliance with Paragraphs 20-22 of this Agreement by, among other things, arranging for meetings and discussions with NBME personnel, requesting copies of any documents related to compliance with this Agreement, or both. The United States may enforce this Agreement. If the Department believes that this Agreement or any portion of it has been violated, it will raise its concern(s) with the NBME and will attempt to resolve the concerns(s) in good faith. The Department will give the NBME thirty calendar days from the date it notifies the NBME of any breach of this Agreement to cure that breach, prior to instituting any court action.

24. Disputes. If the Department and NBME are unable to reach a resolution of any issues covered by this Agreement, the Department may seek appropriate relief. Failure by the Department to enforce any provision or deadline of this Agreement shall not be construed as a waiver of its right to enforce other provisions or deadlines of this Agreement.

25. Entire Agreement. This Agreement constitutes the entire Agreement between the Department and NBME on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by the Department or NBME or their agents, that is not contained in this written Agreement shall be enforceable regarding the matters raised herein.

26. Agreement Binding on NBME. This Agreement shall be binding on the NBME, as well as the NBME's officers, agents, and employees, and their successors in interest. The NBME shall have a duty to so notify all such successors in interest of the existence and terms of this Agreement.

27. No Admission. This Agreement is not an admission by NBME of any violation of the ADA or its implementing regulations.

28. Term of the Agreement. This Agreement shall remain in effect for three years from the effective date.

29. Severability. If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

30. Public Document. This Agreement is a public document. A copy of this document, or any information contained herein, may be made available to any person. The Department and NBME shall provide a copy of this Agreement to any person or entity upon request.

31. Release. The Department will obtain a Release from Frederick Romberg in the form attached as Exhibit A to this Agreement.

32. No Retaliation. The NBME agrees that it will not discriminate or retaliate against any person within the meaning of the requirements of 28 C.F.R. § 36.206.

Case 3:11-cv-01279-JSC Document 4-1 Filed 03/23/21 Page 49 of 56

33. <u>Authorization of Signatories</u>. The individuals signing this Agreement represent that they are authorized to bind the Department and NBME to this Agreement.

34. <u>Effective Date</u>. This Agreement shall be effective on the date it is signed by the last signatory.

FOR NBME:                               FOR THE UNITED STATES OF AMERICA:

By:                                     By:

_____             _____

Dated: _____              THOMAS E. PEREZ
                                        Assistant Attorney General
                                        SAMUEL R. BAGENSTOS
                                        Principal Deputy Assistant Attorney General
                                        JOHN L. WODATCH
                                        Deputy Assistant Attorney General


                                        _____
                                        RENEE M. WOHLENHAUS, Acting Chief
                                        KATHLEEN P. WOLFE, Acting Special Legal Counsel
                                        SHEILA K. DELANEY, Trial Attorney
                                        Disability Rights Section – NYAV
                                        Civil Rights Division
                                        U.S. Department of Justice
                                        950 Pennsylvania Avenue, NW
                                        Washington, D.C. 20530
                                        Telephone: (202) 307-6309
                                        Facsimile: (202) 305-9775

                                        Dated: _____ 02/23/2011 _____

Cases & Matters by ADA Title Coverage I Legal Documents by Type & Date I ADA Home Page

February 23, 2011

# EXHIBIT "G"

**Wells v. National Board of Medical Examiners, et al.**



**MEDICAL BOARD**
OF CALIFORNIA

Protecting consumers by advancing high quality, safe medical care.

Licensing Program
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815-5401
Phone: (916) 263-2382
Fax: (916) 263-2487
www.mbc.ca.gov

Gavin Newsom, Governor, State of California | Business, Consumer Services and Housing Agency | Department of Consumer Affairs

November 25, 2019

Via Email and Regular Mail
Cornell Wells

Dear Dr. Wells:

This letter is to follow up regarding our conversation pertaining to your license being issued in error on July 8, 2014, before passing the required Step 3 of the United States Licensing Medical Examination (USMLE).

Earlier this year, the Board notified you that you were required to sit and pass Step 3 of the USMLE. On October 22 – 23, 2019, you sat for the required examination and were notified on November 13, 2019, that you failed the examination. As a result of failing the required examination, you are required to place your license on an inactive status by Tuesday, December 24, 2019. For your convenience, I have attached the Application for Inactive License. You are not permitted to practice medicine while you are in inactive status.

According to the Federation of State Medical Boards (FSMB), you cannot be rescheduled to take the examination before six months unless the Board provides a written request to FSMB. At your request, I have attached a written letter of authorization to FSMB requesting that you sit for the Step 3 of the USMLE before the six month waiting period. You must pass Step 3 of the USMLE within one year from the date of this letter, or the Board will take action to have your license revoked pursuant to Business and Professions Code (BPC), section 2235.

Pursuant to BPC, section 2177 (c)(1), you shall have obtained a passing score on all parts of Step 3 of the USMLE within not more than four attempts in order to be eligible for a physician's and surgeon's license. Because you failed Step 3 of the USMLE on May 7, 2014, June 25, 2014, and October 23, 2019, you must pass the examination on the fourth attempt or the Board will be required to take action to have your license revoked.

If you have any questions, please contact me at (916) 274-6193, or by e-mail at: Christina.thomas@mbc.ca.gov.

Sincerely,

Christina Thomas
Licensing Manager

# EXHIBIT "H"

**Wells v. National Board of Medical Examiners, et al.**



**MEDICAL BOARD**
OF CALIFORNIA

Protecting consumers by advancing high quality, safe medical care.

Licensing Program
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815-5401
Phone: (916) 263-2382
Fax: (916) 263-2487
www.mbc.ca.gov

Gavin Newsom, Governor, State of California  |  Business, Consumer Services and Housing Agency  |  Department of Consumer Affairs

*Sent via U.S. Mail and Email*

November 25, 2019

Federation of State Medical Boards
400 Fuller Wiser Road
Euless, TX 76039
dcusson@fsmb.org

RE:    Cornell Wells
        USMLE ID# 51988087

Dear Federation of State Medical Boards:

This letter is to request that Cornell Wells, M.D., be allowed to sit for Step 3 of the United States Medical Licensing Examination (USMLE) before the six month eligibility period.

Earlier this year, the Federation of State Medical Boards (FSMB) brought to the Medical Board of California's (Board) attention that Dr. Wells was issued a medical license in error, in that he had failed to pass Step 3 of the USMLE. The Board immediately contacted Dr. Wells and informed him that he must sit and pass Step 3 of the USMLE. On November 13, 2019, Dr. Wells was notified that he failed Step 3 of the USMLE on his third attempt.

The Board is aware of the FSMB's policy that an individual must wait at least six months after the most recent attempt of Step 3 before rescheduling, however, this is a highly unusual circumstance and the Board respectfully requests that FSMB allow Dr. Wells to sit and take Step 3 of the USMLE before the six month eligibility period.

The Board appreciates your consideration and assistance in this matter. If you have any questions, please contact Mrs. Christina Thomas, Licensing Manager, at (916) 274-6193 or via email at: christina.thomas@mbc.ca.gov.

Sincerely,

Christine J. Lally
Interim Executive Director

# EXHIBIT "I"

**Wells v. National Board of Medical Examiners, et al.**



---------- Forwarded message ---------
From: **USMLESec** <USMLESec@nbme.org>
Date: Mon, Dec 23, 2019 at 7:21 AM
Subject: USMLE Step 3 Retake Pacing Policy Exception Request -
Cornell Wells 51988087
To: Christina.Thomas@mbc.ca.gov <Christina.Thomas@mbc.ca.gov>,
Christine.Lally@mbc.ca.gov <Christine.Lally@mbc.ca.gov>
Cc: cornellwells1122@gmail.com <cornellwells1122@gmail.com>


Dear Ms. Lally,


Your December 17, 2019 letter regarding Cornell Wells was forwarded to
the Office of the USMLE Secretariat for review. As I stated in my email to
you and in an email to Dr. Wells, the reasons supplied in your  previous
letter are not within the purview of our retake pacing exception policy. The
reasons detailed in your most recent letter also do not fall within our
retake pacing exemption policy and we are unable to approve the request
at this time.

If there are any circumstances that are not detailed in your letters that would require Mr. Wells to test immediately, please send that information to our office for review.

If you have any questions, please let me know. Thank you for your attention in this regard.

Sincerely,

Nicole Miller

---

**Nicole Miller** | Program Manager | USMLE Secretariat

**National Board of Medical Examiners** | 3750 Market Street, Philadelphia, PA 19104

☎ 215 495 6136 | ✉ usmlesec@nbme.org

*Follow USMLE on Social Media*

*This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.*